**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 11, 2009

Charles R. Fulbruge III
Clerk

No. 07-50513

UNITED STATES OF AMERICA

Plaintiff-Appellees

v.

HORACIO FERNANDEZ; DIANA MARQUEZ; HECTOR LEONEL
MARQUEZ-RAMOS, also known as Hector Marquez

Defendants-Appellants

Appeal from the United States District Court
for the Western District of Texas

Before JONES, Chief Judge, and OWEN and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Three jointly tried defendants appeal their convictions and sentences relating to a major drug-trafficking conspiracy. We AFFIRM.

## I. BACKGROUND

Horacio Fernandez, Diana Marquez, and Hector Leonel Marquez-Ramos were each convicted by a jury of multiple counts – some overlapping, others unique – resulting from their involvement in a marijuana importation conspiracy based in Juarez, Mexico and El Paso, Texas. Production and distribution networks extended considerably deeper into each country.

Taking the evidence in the light most favorable to the government, all were part of a group known as the Marquez Drug Trafficking Organization (the "Organization"), whose leader was Mario Marquez. While not a defendant, Mario played a central role in the relevant events. Hector Marquez-Ramos is Mario's brother; Diana Marquez was his wife; Horacio Fernandez was a long-time associate convicted of serving as the Organization's money-laundering expert.

Fernandez was charged solely with money-laundering counts. He was sentenced to two concurrent terms of 160 months' imprisonment. Diana Marquez was charged with money laundering and with drug distribution and importation. She was sentenced to multiple concurrent terms of imprisonment, the longest of which were for 360 months. Hector Marquez-Ramos was charged with multiple drug counts as well as the most serious offense, conspiracy to murder in a foreign country. He was sentenced to multiple terms of life imprisonment and one term of 40 years' imprisonment, all to run concurrently. We separately address the contentions of each defendant.

## II. DISCUSSION

*A. Hector Fernandez*

*1. a. Sufficiency of the Evidence on Money Laundering Counts*

Fernandez argues that the evidence was insufficient to support the jury verdict convicting him of one count of conspiracy to launder money and another of substantive money laundering. *See* 18 U.S.C. § 1956(h), 1956(a)(1)(B)(i), (ii). Because Fernandez objected to the sufficiency of the evidence at the trial level, we evaluate whether a reasonable jury could have found that the evidence established the guilt of the defendant beyond a reasonable doubt. *United States v. Lewis*, 476 F.3d 369, 377 (5th Cir. 2007). Due to the jury verdict of guilt, the evidence is viewed in the light most favorable to the government, which receives all reasonable inferences and credibility choices. *Id.*

The specific nature of this conspiracy required the government to show that Fernandez knowingly conspired with at least one other person to (1) conduct or attempt to conduct a financial transaction; (2) with the knowledge that it involved proceeds of specified unlawful activity (here, controlled substance offenses); and (3) with the knowledge that the transaction was designed in whole or in part to conceal the nature, source, ownership, or control of the proceeds, or to avoid a federal or state reporting requirement. *United States v. Adair*, 436 F.3d 520, 524 (5th Cir. 2006).

The government's conspiracy case was that Fernandez served as a conduit for the proceeds of the Organization, using real estate transactions as a cover. The conspiracy was alleged to have existed from August 1988 until July 2005.

A major part of the government's case was the testimony of an undercover agent, Liss, who met with Fernandez on numerous occasions while posing as a Colombian "high-level drug trafficker." Liss began meeting with Fernandez in July 1995. He testified that Fernandez was paranoid about potential surveillance by law enforcement, insisting meetings take place outdoors with only one other person, and scanning police frequencies for evidence of detection. Fernandez was justified in his paranoia. After Liss said he had "large sums of money that needed to be laundered," Fernandez responded that he could help with real estate and investment transactions. According to this testimony, Fernandez responded to a request for more details about his money laundering techniques by saying, "I don't ask you about your drug business, you should not ask me about my money laundering business, or how I move the money." Fernandez also mentioned that most of his experience was with the proceeds of marijuana, while Liss presumably would be dealing in cocaine.

The government also introduced approximately two hours of recorded phone calls between Liss and Fernandez, during which Fernandez offered to introduce Liss to Fernandez's "friend," a Mexican "high-level drug trafficker."

The government asserts this was a reference to Mario Marquez. Liss testified that the conversations contained various mutually understood coded references to the drug trade, including discussions of "real estate."

The government next alleges that a number of particular transactions show Fernandez's use of "shell companies" to receive money from Mario and Diana Marquez, launder it, and then return it to them. Examples supported by evidence at trial are said to be these:

- real estate was transferred from the Marquez family to a Fernandez-controlled company, then used as collateral for a half-million dollar loan;

- numerous high-value cashier's checks were exchanged between Fernandez and the Marquezes, which Fernandez could not explain at trial;

- Diana Marquez lived rent free in a house owned by Fernandez;

- Diana Marquez also received false W-2 forms from a Fernandez-controlled corporation by which she was not employed; and

- Mario Marquez wrote Fernandez from prison directing him to deposit immediately as much money as possible in Diana Marquez's account.

One agent summarized the government's case by testifying that "there was a 'flow of money' from Mario Marquez to Horacio Fernandez, 'and everything has shown that the money has come back to the Marquezes.'"

We just reviewed the evidence as to a conspiracy. The substantive money laundering count, also based on Section 1956(a)(1)(B)(i), involved a $17,000 down payment used to purchase a house in El Paso in August 2003. The evidence was that Fernandez, through one of his corporations, sold a note on another property for $80,000, and directed the buyer to remit part of the payment as a $17,000 check to Mario Marquez. The check was deposited in Diana Marquez's account, from which a cashier's check of just under $17,000 was written a few days later to purchase the house that is the subject of the count.

Fernandez argues that he was involved in a legitimate real estate business focused on purchasing properties at foreclosure sales; the cashiers checks that were introduced in the government's case were for legal purposes. Fernandez lists various checks contained in the government exhibits, repeating the basic description of them while stating, with respect to most, that "[n]o tracing was offered to establish the source of these funds or the use made of the funds." Fernandez explains his possession of the funds as resulting from the "substantial revenues" of his real estate business and a "substantial inheritance" he received on his father's death. He also argues that the prosecution's theory was not matched by the evidence, because one government witness testified that Marquez told him that Marquez had transferred ten million dollars to a "real estate person," and that this was shorthand for Fernandez. Since the total amount the court attributed to him at sentencing was just $452,394.15, he argues that the government's theory was contradicted by its own evidence.

Fernandez has not made the high showing required to show the evidence was insufficient to convict him of the conspiracy charge. "Circumstantial evidence may establish the existence of a conspiracy, as well as an individual's voluntary participation in it, and 'circumstances altogether inconclusive, if separately considered, may, by their number and joint operation . . . be sufficient to constitute conclusive proof.'" *United States v. Garcia Abrego*, 141 F.3d 142, 155 (5th Cir. 1998) (quoting *United States v. Roberts*, 913 F.2d 211, 218 (5th Cir. 1990)). Specifically responsive to Fernandez's assertion that the government failed to "trace" the origins of particular checks, the prosecution "is under no duty to trace the individual funds" involved in particular transactions, or to examine a transaction "wholly in isolation if the evidence tends to show that it is part of a larger scheme that is designed to conceal illegal proceeds." *United States v. Rodriguez*, 278 F.3d 486, 491 (5th Cir. 2002).

Given the overwhelming evidence that Mario Marquez was the head of an international drug cartel, the jury could have concluded that the large-scale transfers of money from the Marquezes, through Fernandez or various shell corporations and back again, proved that the funds were the proceeds of the specified drug offenses and that the transactions were designed to conceal the funds' origins. Evidence of Fernandez's close contact with the Marquezes and Liss's testimony were sufficient to permit a reasonable jury to conclude that he was aware of the origins of the proceeds and conscious that he was engaged in money laundering. Fernandez did engage in some legitimate business, but the government had evidence he also engaged in this criminal conduct. He and the Marquezes had a shared interest in race horses, but there was evidence they shared other interests too. The jury had sufficient evidence of guilt.

With respect to the substantive count, the evidence was sufficient for the jury to find that the real estate transaction was a means of returning drug operations' money that the Marquezes had previously transmitted to Fernandez for laundering. Indeed, the fact that the particular money received from the buyer of the note was not drug money did not contradict the government's theory. Rather, it illustrated that the money had been laundered – "clean" money from an outsider was exchanged for the "dirty" money the Marquezes had earlier given Fernandez. At least the jury could have so found, given the number of transactions between them discussed in connection with the preceding count. We affirm Fernandez's convictions.

### 1. b. *Effect of Recent United States Supreme Court Opinion*

On appeal, Fernandez argues that a Supreme Court decision handed down after his conviction requires reversal of his money laundering convictions. *See United States v. Santos*, 128 S. Ct. 2020 (2008). In *Santos*, a plurality of the Court held that the phrase "proceeds of some form of unlawful activity," found in Section 1956(a)(1), means the "profits," rather than merely the "receipts," of

the activity. *Id.* at 2025. Here, the district court instructed the jury that "'proceeds' includes any property, or any interest in property, that someone acquires or retains as a result of the commission of the underlying specified unlawful activity." That instruction did not require jurors to focus on "profits."

We may review a claim raised for the first time on appeal, even when based on an intervening Supreme Court decision, only for plain error. *United States v. Rios-Quintero*, 204 F.3d 214, 215 (5th Cir. 2000). Such a review requires that there be error, that is plain, and that affects the defendant's substantial rights. *Id.* Even then, the court must determine that the error "seriously affects the fairness, integrity or public reputation of judicial proceedings" in order to correct it. *Id.* We will judge whether the error is plain based on the state of the law at the time of the appeal, not of the trial. *Johnston v. United States*, 520 U.S. 461, 468 (1997).

Here, the first two prongs of the inquiry are closely related. In light of *Santos*, it might seem apparent that "proceeds" may not be defined simply as any property acquired at some point during the transaction; "profit" is commonly defined as "the excess of revenues over expenditures." BLACK'S LAW DICTIONARY 1228 (7th ed. 1999).

The issue is complicated by the fact that in *Santos*, Justice Stevens wrote a concurring opinion that was necessary to forming a majority. The plurality justices acknowledged that the Stevens opinion governed to the extent it was narrower than the Court's opinion. *Santos*, 128 S. Ct. at 2031. Justice Stevens found that Congress intended "proceeds" to have different meanings in different contexts. Specifically, he suggested, on the basis of legislative history, that "Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." *Id.* at 2032 (Stevens, J., concurring). Thus, he did not "agree with the

plurality that the rule of lenity must apply to the definition of 'proceeds' for these types of unlawful activities." *Id.* at 2032 n.3.

Justice Stevens's comment that gross revenues were the relevant proceeds applies to the sale of contraband and the operation of criminal organizations, precisely the type of offenses for which Fernandez was convicted. While Justice Stevens and the plurality disagreed over the precise precedential effect of his statement, the uncertainty renders any error here not "plain."

Even were there error that was plain, we must decide whether the error affects Fernandez's substantial rights; that is, whether it "must have affected the outcome of the district court proceedings." *United States v. Mares*, 402 F.3d 511, 521 (5th Cir. 2005). The sharp factual distinctions between this case and *Santos* explain why Fernandez cannot meet that burden. In *Santos*, the defendant was convicted of money laundering based on his role in operating an illegal lottery. He supervised the use of funds collected in the lottery to pay the salaries of those working beneath him, as well as to pay off the winners of the lottery. *Santos*, 128 S. Ct. at 2022-23. He was convicted under 18 U.S.C. § 1956(a)(1)(A)(i), which prohibits conducting a financial transaction with the proceeds of illegal activity "with the intent to promote the carrying on of" additional illegal activity, which in *Santos* was the continued operation of the lottery. It was thus apparent in *Santos* that the conviction could not stand under the new definition of "proceeds," because all the defendant was accused of was plowing the receipts of the gambling operation back into the business.

By contrast, Fernandez's convictions rest on Section 1956(a)(1)(b)(i) and (ii), which prohibit transactions designed to "conceal or disguise" the origins or location of the proceeds of illegal activity, or to avoid legal reporting requirements. Given the scope of the government's evidence that Fernandez was involved in a string of transactions over a period of fifteen years involving real estate, horses, and multiple shell corporations, we are unable to find that the

8

outcome of the trial on these charges would necessarily have been different had the jury known that it must find the transactions were conducted with the "profits" of, rather than property acquired or retained from, the drug-trafficking activity. Fernandez did not simply take the receipts of the Organization and use them to purchase more drugs or pay salaries. Rather, the evidence was that his machinations were designed to conceal large amounts of money not apparently needed to run the operation. That would be "profits."

Because we do not find that the third prong of the plain error test is met, we reject the *Santos* challenge to Fernandez's convictions.

*2. Fernandez Severance Motion*

Fernandez argues that the district court erred in refusing to sever his trial from that of his co-defendants. A district court's refusal to grant a severance is reviewed for any abuse of discretion. *United States v. Arzola-Amaya*, 867 F.2d 1504, 1516 (5th Cir. 1989). A severance must be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable determination of guilt or innocence." *United States v. Bermea*, 30 F.3d 1539, 1572 (5th Cir. 1994).

Fernandez acknowledges the general rule that co-conspirators should be tried together. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). He argues that the seriousness of the drug and conspiracy to kill charges against his co-defendants, together with the breadth of evidence admitted under those counts but irrelevant to the money laundering charges he faced, were sufficient to require severance here.

Fernandez argues that the murder charge against Marquez-Ramos was particularly likely to create unfair prejudice against him. *See United States v. Cortinas*, 142 F.3d 242, 248 (5th Cir. 1998). Unlike in *Cortinas*, Fernandez's involvement with the conspiracy overlapped with the time of the murder, and his co-defendants were not, as in *Cortinas*, unknown to him or operating wholly

9

independently. "Any prejudice created by a joint trial can generally be cured through careful jury instructions." *Bermea,* 30 F.3d at 1572. Such was the case here. The district court emphasized that each charge against each defendant was to be considered separately. The jury was instructed that 19 of the 41 witnesses were not testifying against Fernandez. Other instructions were that each defendant's case "should be considered separately and individually" and "separate consideration" given to each defendant. Fernandez has not overcome the presumption that jury instructions can cure prejudice, or shown that the district court otherwise abused its discretion in refusing to sever his trial.

*3. Alleged Evidentiary Errors Regarding Fernandez*

Fernandez argues that the district court violated evidentiary rules in admitting a proffer letter to him from the government. In June 2005, Immigration and Customs Enforcement agents met with Fernandez to inform him of a threat against his life. The conversation caused Fernandez to provide some information about the Organization and offer to provide more in exchange for immunity from prosecution. The next day, agents brought Fernandez a proffer letter signed by an Assistant United States Attorney ("AUSA"), but he asked for time to consult with his attorney. No deal was ever consummated. At trial, the district court permitted agents to testify about this exchange.

The admissibility of evidence is reviewed for abuse of discretion. *United States v. Coleman*, 997 F.2d 1101, 1104 (5th Cir. 1993). When, as here, no objection was made at trial, this court reviews for plain error. *United States v. Jones*, 484 F.3d 783, 792 (5th Cir. 2007).

A "statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty" is not admissible. F.R. E. 410(4). That prohibition is inapplicable because Fernandez's discussions were with government attorneys, not with law enforcement officers. *United States v. Keith*, 764 F.2d 263, 265 (5th Cir. 1985). Although a prosecutor

signed the proffer letter that Fernandez sought after the first day's discussions, Fernandez does not explain how his initial statements to law enforcement agents, prior to contacting any attorney, could have been made "in the course of plea discussions with an attorney for the prosecution."

Rule 408 makes inadmissible evidence of "furnishing or offering or promising to furnish . . . a valuable consideration in compromising or attempting to compromise a claim," as well as "conduct or statements made in compromise negotiations regarding the claim." In this circuit, Rule 408 applies to criminal cases. *United States v. Hays*, 872 F.2d 582, 588-89 (5th Cir. 1989). Even assuming that it was error to admit the evidence under Rule 408, the mistake would not satisfy the plain error test, which requires that an error be plain, affect substantial rights, and seriously affect the fairness, integrity, or public reputation of judicial proceedings. *Jones*, 484 F.3d at 792. To ask whether a substantial right was affected is to ask whether the error "must have affected the outcome of the district court proceedings." *United States v. Mares*, 402 F.3d 511, 521 (5th Cir. 2005). The defendant bears the burden of persuasion. *Id.* Fernandez does not meet that burden. He does not address the effect of the weight of the evidence against him, which, as we have discussed, was substantial and sufficient for conviction without the proffer letter evidence. Moreover, the most that Rule 408 would appear to bar is Fernandez's opening of the discussion about immunity and the ensuing letter; the preceding conversation with the agents, including his knowledge and possession of records relating to Marquez and perhaps even his offer to "help out," which occurred before he decided to ask for protection, would remain admissible. Thus, Fernandez cannot show that any violation of Rule 408 was plain error, and we affirm on this issue.

### 4. Brady Error Regarding Fernandez

Fernandez alleges that the government failed to provide all evidence favorable to him, as it is required to do. *Brady v. Maryland*, 373 U.S. 83, 87

(1963). The alleged violation was the failure to turn over to the defense a 1995 internal report written by a former IRS agent. According to Fernandez, his investigator located the agent after trial. The report was issued at the conclusion of the earlier investigation. Fernandez argues that it found no evidence against him of money laundering or tax evasion.

Though there are issues now regarding the report itself and what it said, the 1995 investigation and its discontinuation were known at the time of trial. Jurors were told in closing argument that the government had all this evidence in 1995 and did nothing. Only after the trial was the report finally obtained at the request of the prosecutor from the regional office of the IRS. The district judge examined the report *in camera* when it was submitted as part of the motion for a new trial. He found no exculpatory material in the report.

When a defendant seeks a new trial on the basis of a *Brady* violation, he must show that "(1) the prosecution did not disclose the evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material–i.e., there is a reasonable probability that if the government had disclosed the evidence, the result of the proceeding would have been different." *United States v. Infante*, 404 F.3d 376, 386 (5th Cir. 2005). We review the existence of a *Brady* violation *de novo. Id.*

The government argues that neither the second nor third factors are satisfied here. We have noted that the district court found that there was no exculpatory material in the report. The only evidence Fernandez offers that the report was exculpatory is an unsworn post-trial interview with the former IRS agent who wrote it. Other courts have held that the subjective opinion of a non-witness agent as to the quantity or quality of evidence is not relevant to this question. *See Williams v. United States*, 74 F.3d 1242, 1996 WL 4358, at *4 (7th Cir. 1996) (unpublished table decision); *United States v. Montalvo*, 20 F. Supp. 2d 270, 279 (D.P.R. 1998). Even if there was favorable evidence, it was not

material. That is because Fernandez's counsel was already aware that an investigation had taken place in the mid-1990s that led to no action against his client, and argued this point to the jury at closing argument.

Given the scope of the evidence against Fernandez over the entire period of the charged conspiracy, there is no reasonable probability that the outcome would have changed had a report from 1995 – ten years before the end of the conspiracy – been introduced. Moreover, Fernandez does not offer an analysis of the document or explain why the district court's evaluation of it as non-exculpatory was erroneous. We find no *Brady* violation.

*5. Fernandez Sentencing Errors*

Finally, Fernandez raises a number of claims with respect to his sentence. Sentences are reviewed for reasonableness. A sentence within the properly calculated Guidelines range is presumed reasonable on appeal. *United States v. King*, 541 F. 3d 1143, 1145 n.1 (5th Cir. 2008) (stating that we continue to apply this presumption after it was approved in *Rita v. United States*, 127 S. Ct. 2456, 2466-68 (2007)). Findings of fact used in calculating the Guidelines range are reviewed for clear error, while interpretation of the Guidelines themselves is reviewed *de novo*. *United States v. Conner*, 537 F.3d 480, 489 (5th Cir. 2008).

Fernandez challenges several aspects of the calculation. The first concerns the amount of laundered funds. The district court found that the total amount of laundered funds for which Fernandez was responsible was $535,514.78. Fernandez's principal objection to this sum is that the court should not have included the $100,000 proceeds from the sale of thoroughbred horses that had been owned by Mario Marquez and purchased by a Fernandez-operated company a few days after Marquez was arrested. Fernandez testified about his sale of the horses and return of the money to the Marquez family. Part of the basis for alleging error is a dispute over the meaning of Fernandez's testimony at trial. He was asked if he remembered the sales price for the horses, and he answered:

"Just kind of guessing would be maybe, like, 100,000, if the horses were sold for what they should have; maybe 120." The punctuation, of course, was provided by the court reporter. At sentencing, the district court agreed with the prosecutor's opinion that Fernandez was asserting that the horses "should have" sold for $120,000, but in fact only sold for $100,000. While the testimony is perhaps subject to more than one plausible interpretation, the district judge chose a plausible meaning. We find no clear error.

Fernandez argues that, even if $100,000 was the correct amount, it was improper to attribute the money to the proceeds of illegal drug activity. There was, though, substantial evidence on the scope of the Marquez Organization and the cash flow it generated. The evidence was overwhelming that Mario Marquez was a major international drug smuggler, who had no other apparent source of income, and the horses were sold and $100,000 transferred in response to his arrest. Thus, the court could permissibly conclude that the horses had originally been purchased with drug proceeds.

Fernandez also objects to a six-level increase due to his belief that the funds were the proceeds of, or were intended to promote, a controlled-substance offense. *See* U.S.S.G. § 2S1.1(b)(1). The jury had to find that Fernandez was aware the proceeds stemmed from controlled-substance violations in order to convict him of the money laundering counts. It was not error for the district court to make the same finding.

Next, Fernandez objects to a two-level increase for abusing a public trust or using a special skill in the commission of his offenses. *See* U.S.S.G. § 3B1.3. The special skill adjustment was justified in the PSR by Fernandez's position as a licensed real estate broker, which it found was instrumental to the means by which he laundered money. This adjustment is supported by the facts. The district court could have found in at least two of the real estate transactions examples of particular skill. The application note for the "special skill"

14

enhancement refers to occupations for which "licensing" is required; Fernandez was a licensed real estate agent.

Finally, Fernandez objects to a two-level enhancement for sophisticated money laundering. *See* U.S.S.G. § 2S1.1(b)(3). Both sides rely on commentary for that provision. It lists four circumstances to be considered in determining whether the enhancement applies: 1) fictitious entities, 2) shell corporations, 3) layered transactions with illegitimate funds, and 4) offshore accounts. The district court could have concluded that the charged transactions involved multiple transactions, i.e., "layering," and that a number of Fernandez's corporation were shell corporations. We once upheld use of the sophisticated money laundering enhancement when the conduct was arguably less egregious than that here. *See United States v. Charon*, 442 F.3d 881, 891 (5th Cir. 2006).

We affirm Fernandez's convictions and sentence.

## B. Diana Marquez

### 1. a. Sufficiency of the Evidence on Diana Marquez's Drug Counts

Diana Marquez was convicted of conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana, and of conspiracy to import marijuana in the same amount. *See* 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(vii) (possession with intent to distribute); 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(G) (importation). She argues that the evidence was insufficient to convict her on these counts.

To prove a conspiracy, the government must show "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *Conner*, 537 F.3d at 484.

The evidence to prove these charges was largely circumstantial but fairly substantial. One of Diana Marquez's former employers testified that she admitted helping Mario Marquez deliver drugs by carrying them in her purse. She also told the witness that she had sent drug proceeds to her mother, who used the money to buy two houses. Neighbors of the Marquezes and employees of the Organization testified that they had seen marijuana in Diana Marquez's house on several occasions, including "a load of marijuana, in burlap sacks" and "large boxes." There was testimony that Diana Marquez helped others stay aware of Mario's frequently changing cell phone numbers, and told one of the employees to throw away a slip of paper with the number on it. There was evidence that Diana Marquez "was the one that knew the immigration people" who could ease the importation of drugs at the border. She was involved in a trip to find a house in El Paso that became a convenient transhipment point for marijuana. Two witnesses testified that Diana Marquez was involved in conversations during the trip about the suitability of various houses for drug operations, including favoring one house because it had a basement for storage.

A key witness against all the defendants was Ricardo Sepulveda, who had worked for the Organization. It was the murder of his mother in Juarez for which one of the other defendants was convicted. Sepulveda testified to overhearing Diana Marquez warn Mario Marquez not to return home after their house was searched, and that she had boasted about agents not finding drug-related documents during the search. There was testimony that she had helped Mario Marquez in his search for Sepulveda after he had fled the house where his mother was killed.

In addition to the testimony about Diana Marquez's actions and words, there was incriminating evidence found in her locker at the Texas Alcoholic Beverage Commission office where she worked. When opened after her arrest,

it contained $8,000 in cash, deposits slips totaling close to $90,000, and a statement from a Mexican bank showing a balance of $118,569.18.

All this evidence was more than sufficient to support Diana Marquez's conviction for conspiracy to possess with intent to distribute marijuana.

With respect to the importation count, there was testimony from Sepulveda that Diana Marquez would call Mario Marquez to inform him what traffic lane at the border station was harder that day to use for importation. Sepulveda testified that she "played a role of importing marijuana and drugs through the port of entry." He also testified that drug couriers, after crossing the border from El Paso into Juarez, frequently saw Diana Marquez at the "yellow and green house," where one saw her holding a six-inch stack of money, with another such stack nearby.

This mass of evidence fully supports a finding that Diana Marquez was not just present during the conspiracy. Her presence and association is part of the circumstantial evidence that she voluntarily joined the conspiracy; that a party does not physically possess drugs and plays a minor role – though whether Diana Marquez's role should be labeled "minor" is debatable – does not defeat conviction. *United States v. Ayala*, 887 F.2d 62, 67-68 (5th Cir. 1989). It is true that evidence of involvement in a conspiracy can be too attenuated to sustain a conviction. *United States v. Gardea-Carrasco*, 830 F.2d 41, 44-45 (5th Cir. 1987). That defect does not exist in the evidence against Diana Marquez. The testimony against her did not describe a person unluckily present on only a single occasion. Her knowledge of the illegal activity and assistance to its success were sufficiently proven.

We affirm the convictions on the drug counts.

*1. b. Evidence Sufficiency on Diana Marquez's Money Laundering Counts*

Diana Marquez next challenges her convictions for conspiracy to commit money laundering, and for two counts of engaging in monetary transactions with

17

criminally derived property in excess of $10,000. *See* 18 U.S.C. § 1956(h), 1956(a)(1)(B)(i), (ii) (money laundering); 18 U.S.C. § 1957 (criminal proceeds).

The conspiracy count was the same as that charged against Fernandez. She needed to be engaged in a conspiracy with at least one other person: (1) to conduct or attempt to conduct a financial transaction; (2) with the knowledge that it involved proceeds of specified unlawful activity; and (3) with the knowledge that the transaction was designed in whole or in part to conceal or disguise the nature, source, ownership, or control of the proceeds, or to avoid a federal or state reporting requirement. *See Adair*, 436 F.3d at 524-25.

Marquez primarily argues that the evidence of her knowledge was missing. In her argument, she was "a housewife kept in the dark," who had no knowledge of the criminal origins of the funds she used. There certainly was evidence to dispel the darkness that she argues surrounded her. She accepted substantial money and rent-free housing from Fernandez. Sepulveda testified that she told him she was going to pick up deeds to property that had been "washed to the kid's names." She and Fernandez participated in a property-holding entity called the "Marquez land trust." She personally purchased houses with large sums of unexplained cash, including a house purchased in her son's name. The banking records in her locker at work also would have shed some light on the money laundering conspiracy.

Given the evidence against Fernandez, and the sufficiency of the evidence of Diana Marquez's involvement in the drug conspiracy, jurors could reasonably infer that she was aware of the origins of the money Fernandez gave her when her husband was in prison, and also knew of Fernandez's role in the Organization. After all, she referred to Fernandez as "the real estate person," whom she had to meet in order to get "washed" deeds to property. Further, the jury could have drawn an inference of guilt from the purchase of the house in her son's name. The evidence was sufficient for a conviction on this count.

18

Diana Marquez also was charged with the knowing use of criminal proceeds in relation to her purchases in 2005 of two houses in her 17- or 18-year-old son's name in El Paso. *See* 18 U.S.C. § 1957. Payment for one was with $75,000 in cash; for the other, she provided $21,000 in assorted money orders and cashier's checks. Diana Marquez does not dispute that she purchased the houses, but she argues the government failed to show the origins of the money. She claimed the money for one came from a gift from Mario Marquez to their son on his high school graduation, and for the other the funds were from the son's selling of cars given to him by a member of the Organization described as Mario Marquez's "right-hand man," at Mario's direction. She again argues that the money could have come from Mario's ranching and farming operations just as well as from marijuana smuggling, and that since she had no knowledge of any drug activity, she could not know where the money came from.

The evidence was that Mario Marquez had little legitimate income. Diana Marquez's salary was about $21,000 per year. There was testimony that she referred to her "washing" money through her children. A jury's reasonable credibility choices, given the totality of the evidence about her involvement in the Organization generally, the unusual nature of a $75,000 cash transaction, and her other connections to money laundering, would support her conviction.

We affirm the money laundering convictions.

*2. Severance of Diana Marquez*

Like Fernandez, Diana Marquez argues that she suffered unfair prejudice because of the joint trial. As we noted when discussing this issue when it was raised by Fernandez, there is a danger of prejudice towards a defendant whose co-defendants are charged with violent acts with which she has no connection. *Cortinas*, 142 F.3d at 248. The violent act – conspiracy to commit murder – that she wishes not mentioned was charged against her brother-in-law, Hector Marquez-Ramos. The government's evidence placed Diana Marquez in the

vicinity of the Mexican house where the murder occurred the day before it happened. There was evidence that she aided her husband Mario Marquez in his pursuit of Sepulveda, who fled the house after his mother was seized. Rather differently, we found a severance required in *Cortinas* when members of a conspiracy were jointly tried with co-defendants whom they did not know and whose terms as co-conspirators did not overlap with their own. *Id.*

Diana Marquez has not shown that the district court's refusal to sever resulted in a specific trial right being infringed or jurors being unable to make a reliable determination of guilt in her case. Severance was not required.

*3. Sentencing Error as to Diana Marquez's Drug Counts*

The district court found that Diana Marquez was responsible for 48,751.5 kilograms of marijuana. Under the Sentencing Guidelines, that quantity resulted in a range of 360 months to life. Her sentence was 360 months.

Diana Marquez asserts that this drug quantity could not have resulted from activity "reasonably foreseeable" to her as a member of the conspiracy. *See* U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Carreon*, 11 F.3d 1225, 1230 (5th Cir. 1994). Reasonable foreseeability does not require proof of knowledge of specific quantities; a defendant with an "obvious understanding of the general breadth of the drug enterprise" may be held liable for the full amount involved. *United States v. Duncan*, 191 F.3d 569, 576 (5th Cir. 1999). We have already discussed the evidence that supports Diana Marquez's knowledge of the breadth of the conspiracy. We also note that the government in fact consented to halving the drug amount attributed to the conspiracy as a whole.

Marquez argues that her case is like one in which we found procedural error when a "district court had failed to make an express finding that the conspiratorial activity at issue was reasonably foreseeable as required" by the Guidelines, and noted that Federal Rule of Criminal Procedure 32 requires the district court to make findings about contested facts in the Presentence Report.

*Carreon*, 11 F.3d at 1230-31. On the other hand, district courts need not ritualistically detail each possible finding. When "the findings in the PSR are so clear" that guesswork by the reviewing court is unnecessary, the sentencing judge may "make implicit findings by adopting the PSR." *Id*. at 1231. Here, it cannot be said, as was the case in *Carreon*, that Marquez makes "voluminous" or particular objections to the multiple, specific findings of various drug quantities from the PSR. The district court, in rejecting her objection to the PSR, did not use the phrase "reasonably foreseeable," although Marquez's attorney had used it just before the ruling. We find the court made a sufficiently clear ruling on the issue. Accordingly, there was no procedural error in the calculation.

The next argument is that the district court failed to consider the disparity in her sentence and those of her more culpable co-conspirators who pled guilty. "[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," is one of the factors a sentencing judge must consider. 18 U.S.C. § 3553(a)(6). A within-Guidelines sentence is presumptively reasonable on appeal. *King*, 541 F. 3d at 1145 n.1. We have held that "concern about unwarranted disparities is at a minimum when a sentence is within the Guidelines range." *United States v. Willingham*, 497 F.3d 541, 545 (5th Cir. 2007). Marquez does not inform us of the offenses for which the other defendants she lists were convicted, so we cannot compare the similarity of their conduct. Moreover, she does not cite any authority that found a within-Guidelines sentence (indeed, at the bottom of the Guidelines range) unreasonable on a similar basis. The district court did not commit clear error in this aspect of its sentencing.

*4. Sentencing Error as to Diana Marquez's Money Laundering Count*

Along similar lines, Marquez objects to the disparity between her sentence and Fernandez's on the money laundering counts. Fernandez received a total

sentence of 160 months, while she received the statutory maximum, 240 months. This was because the district court calculated her Guidelines range using a cross-reference to her drug convictions, and applied "[t]he offense level for the underlying offense [drug conspiracy] from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1). Fernandez was not convicted of drug crimes, and thus was sentenced based on a different Guideline. *Id.* § 2S1.1(a)(2).

This objection was not made at sentencing, so review is for plain error. *United States v. Peltier*, 505 F.3d 389, 391 (5th Cir. 2007). Marquez's argument is cursory and cites no authority for the proposition that the different sentences create reversible error. Given that Fernandez was not convicted of the drug conspiracy offenses, there was a reasonable basis for the district court to take different courses in the two sentencings.

Marquez's convictions and sentence are affirmed.

## C. *Hector Leonel Marquez-Ramos*

Hector Marquez-Ramos was convicted of the most serious charge of the three defendants, conspiracy to murder in a foreign country. *See* 18 U.S.C. § 956(a)(1). He was charged in connection with the murder of Maria Eliza Liuzza in Juarez, Mexico. He was also convicted of four drug counts: conspiracy to possess with intent to distribute 1000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vii); conspiracy to import 1000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 960(b)(1)(G); possessing with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B)(vii); and distributing 1000 kilograms or more of marijuana with the intent that it be imported into the United States, in violation of 21 U.S.C. § 959.

He raises several issues regarding his conviction and his sentence, which we now examine.

*1. Evidence Against Marquez-Ramos on Conspiracy to Murder*

Marquez-Ramos first challenges the sufficiency of the evidence on the count regarding conspiracy to murder. This is the relevant statutory language:

> Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder . . . shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

18 U.S.C. § 956(a)(1).

The offense can be divided into four elements relevant to the facts of this case: (1) Marquez-Ramos and at least one other person agreed to murder Maria Elida Liuzza; (2) he knew the unlawful purpose of the agreement and joined it willingly; (3) one of the conspirators committed at least one overt act in the United States furthering the conspiracy; and (4) at least one of the conspirators was within the jurisdiction of the United States when that person conspired. *See United States v. Wharton*, 320 F.3d 526, 537-38 (5th Cir. 2003).

Marquez-Ramos argues that the government failed to meet three of these four elements. First, he argues there was no showing that any of the conspirators were within the jurisdiction of the United States when the agreement was made; second, that there was insufficient evidence that any agreement to kill Liuzza had been made at all; and third, that no overt act had occurred. He also argues that no showing was made that Liuzza was killed by "choking or beating," as alleged in the indictment.

We first explain in some detail the government's evidence of the murder conspiracy. Hector Marquez-Ramos is the brother of Mario Marquez, the latter being the head of a major drug enterprise that imported large quantities of drugs, especially marijuana, from Mexico into the United States. In early 2005,

23

the Organization was "in turmoil," after increasingly frequent drug seizures, difficulties in transmitting drugs and money, and infiltration by the authorities. Marquez-Ramos, who had served as an "enforcer" for the Organization in the past, was dispatched, with another member of the group, to Detroit, the residence of Ricardo Sepulveda, the Organization's main agent in the Midwest.[1] The Organization had grown increasingly frustrated with Sepulveda over the preceding months, as he had refused orders to carry out a murder for hire and to pick up a large truckload of marijuana for distribution. He owed around a million dollars to the Organization. While in Detroit, Marquez-Ramos had Sepulveda show him where some lower level members of the Organization who were suspected of stealing from the group lived. Marquez-Ramos told Sepulveda that he planned to have them killed. While Marquez-Ramos was in Michigan, Sepulveda told him he wanted to quit the Organization.

After Marquez-Ramos left the Midwest, Sepulveda received a call from Mario Marquez asking him to go to Juarez, Mexico to "touch base" and smuggle cash back into Mexico. Sepulveda took his mother with him. They arrived in El Paso on February 13, 2005. When at a Marquez-controlled house in El Paso, Marquez-Ramos and another Organization member, Esaul Guerrero, packed bundles of cash into the door panels and console of Sepulveda's truck. Sepulveda and his mother that evening then crossed into Mexico.

On arrival at an Organization house in Juarez, Mexico known as the "yellow and green house," Sepulveda asked to be paid for the cash smuggling. Mario Marquez said he would have to wait for another Organization member to arrive. The next day, Sepulveda was once again told to wait another day. That night there was a cookout at the yellow and green house. Mario Marquez told Sepulveda that he was concerned that a member of the Organization in the

---

[1] The testimony of Sepulveda, who pled guilty and testified for the government at trial, is a major source of the information about the conspiracy to kill count.

Midwest, whom Sepulveda had brought into the Organization, had threatened to go to the authorities. They also talked about Marquez-Ramos's trip to the Midwest. Sepulveda then told Mario, as he had earlier told Marquez-Ramos, that he wanted to "pull out" of the Organization.

The next morning, Sepulveda and his mother wanted to leave and return to the United States. Mario Marquez asked them to stay and have breakfast. Marquez-Ramos took them to a restaurant. When they returned to the yellow and green house, Sepulveda saw a man with a "wooden handle" outside. Later, when he, his mother, Marquez-Ramos, and others were inside the living room, yet another Organization member arrived and said he had been in a car accident. Sepulveda and Marquez-Ramos went outside to see what had happened, passing the putative accident victim and others on their way in. Marquez-Ramos then "rushed" back inside, and Sepulveda realized there was nothing wrong with the car. When he reentered the house, Sepulveda found his mother, Maria Elida Liuzza, laying on the floor. One man was on top of her with "an object in his hand," while another Organization member washed his hands in the kitchen. His mother was moaning, in pain, and out of breath.

Sepulveda immediately ran out of the house, pursued by some of the men. He apparently was helped by a motorist to reenter the United States. Once there, he went to the authorities. They taped a series of calls he made to Mario and Diana Marquez; both Marquezes repeatedly asked him where he was. Another witness testified that Mario Marquez subsequently told him that Sepulveda's mother was murdered, and that Sepulveda had "escaped."

The government's view of the evidence is that the jury could have found that Marquez-Ramos was part of a conspiracy, hatched in the United States, that had as its object the murder of Maria Elida Liuzza in Mexico. The conspiracy was a late addition to a preexisting conspiracy to murder Sepulveda in Mexico. There was evidence that Marquez-Ramos worked closely with Mario

25

Marquez, and that Marquez-Ramos had past "enforcement" duties that included committing acts of violence against suspected traitors to the Organization. The motive for Mario Marquez and Marquez-Ramos to kill Sepulveda would be the disarray in the Organization, Sepulveda's owing money to Mario Marquez, Sepulveda's having declined to undertake two jobs, and Sepulveda's telling Marquez-Ramos he planned to quit. The motive to kill his mother arose when he arrived in El Paso with her. That placed her "naturally within the ambit of the plan to kill," because she could not safely be left alive.

Thus, the government's theory was that Mario Marquez's invitation for Sepulveda to go to Juarez was a ruse for the planned murder. An overt act occurred when Marquez-Ramos met Sepulveda in El Paso and loaded the bundles of cash into his truck for smuggling into Mexico.

Another question is whether one of the conspirators was within the United States when he conspired. The government offers two possible ways to answer the question favorably. One is that jurors could have inferred that Marquez-Ramos and Esaul Guerrero, "tacit[ly] or otherwise," hatched the conspiracy to kill Liuzza when both men were present in El Paso. They would have realized it would be necessary to do so as part of the existing conspiracy to kill Sepulveda. The other possibility is that Mario Marquez, at that time in Mexico, "would have been informed . . . immediately" of Liuzza's arrival with Sepulveda. An understanding about the need for murder would have been reached with the El Paso conspirators during an international phone call.

There is no evidence in the record of such a telephone call, though that one was likely made is logical. We need not decide if such speculation suffices, as the evidence was sufficient to sustain the conviction without the phone-call theory. Substantial, if circumstantial, evidence exists that if there was a plan to murder Sepulveda, his arrival in El Paso with his mother would have required consideration immediately to be given as to her fate. One of the two alleged

conspirators who was in El Paso, Esaul Guerrero, while not indicted for the murder in the final version of the indictment, was Mario Marquez's stepson and was indicted for drug activity with the Organization. Co-conspirators need not be identified in the indictment. *United States v. Thomas*, 348 F.3d 78, 82-84 (5th Cir. 2003). Jurors could have found that, while in El Paso, Marquez-Ramos did agree with Guerrero to kill Liuzza in Mexico, satisfying the element of the offense that the conspiracy be formed with someone in this country.

The closely related question is whether the jury could have found a conspiracy to kill Liuzza at all. Given the evidence that Sepulveda owed Mario Maruqez a large sum of money, the evidence regarding Marquez-Ramos's and the Organization's tendency towards violence and murder as management tools, and the eventual fate of Liuzza (and near-fate of Sepulveda), a reasonable jury could find that the invitation to Juarez was a ruse to kill Sepulveda. Then, the jury could have inferred that plan would have needed to include someone Sepulveda brought with him. There was evidence that Sepulveda had brought his mother on such trips in the past, so her arrival may not have been entirely unanticipated. At least it was reasonable for jurors to conclude that the specific plan to kill Liuzza was not finalized, because it could not have been, until she arrived in El Paso.

Next, if Marquez-Ramos and Guerrero commenced their conspiracy to kill Liuzza when they saw her arrive with Sepulveda, the packing of the cash into Sepulveda's vehicle in El Paso was an overt act in furtherance of the conspiracy. Any encouragement to Sepulveda and his mother to continue on to Juarez, any maintaining of the ruse by act or word, would also have been overt acts.

Finally, Marquez-Ramos's argument that the government failed to prove the "choking and beating" portion of the indictment is unpersuasive. What this argument involves is a dispute about the "manner and means" by which the murder was shown to have occurred. The government may even allege that the

"means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means." Fed. R. Crim. P. 7(c)(1). Because stating the manner and means is not necessary indictment language, what is alleged on that point is not essential. A "constructive amendment" of an indictment "occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged." *United States v. Adams*, 778 F.2d 1117, 1123 (5th Cir. 1985). Marquez-Ramos does not explain how the asserted difference between the indictment and the proof offered at trial modified an element of the offense, so what happened here was at most a "variance," not a constructive amendment. *Id.*; *United States v. Dentler*, 492 F.3d 306, 313 (5th Cir. 2007).

In any event, we discern no error. A reasonable jury could have concluded that Liuzza was beaten based on Sepulveda's testimony that he saw one of the assailants entering the house with a "wooden handle," that another man was on top of Liuzza with an object in his hand, and, perhaps most significantly, that an axe handle and stained piece of carpet were recovered from the house by Mexican authorities, and tested positive for Liuzza's DNA.

We affirm Marquez-Ramos's conviction for conspiracy to kill Maria Elida Liuzza in a foreign country.

*2. Evidence Against Marquez-Ramos on Drug Counts*

Marquez-Ramos argues that the evidence was insufficient to convict him on three of the four drug counts – the two conspiracy counts and the substantive possession with intent to distribute count. We also address a slightly different challenge Marquez-Ramos raises with respect to his Section 959 conviction.

With respect to the conspiracy counts, there was testimony that Marquez-Ramos was a high-ranking officer who "was in charge of the money" for the Organization. One witness had seen the Organization import "a little under a ton" of marijuana on at least ten separate occasions. There were multiple

seizures of marijuana at the border of 150-180 pounds. Almost four tons of marijuana was being moved through a Mexican house and drug depot known as "The Castle" at any given time. In El Paso, between 1000 and 1500 pounds of marijuana were shipped out on a daily basis for distribution within the United States. Marquez-Ramos told Sepulveda that, while Mario Marquez was in jail, he imported and exported drugs for the Organization. On another occasion, he said he "controlled a lot of import and exports of the drugs coming in from Mexico to the United States." Mario Marquez told cash smugglers that they could deliver to Marquez-Ramos rather than to him when he was not home. Marquez-Ramos once gave Sepulveda $300,000 in cash to take back to Mexico, and once helped carry at least $1.3 million to a Mexican bank for deposit. The testimony about Marquez-Ramos's violent "enforcer" role on behalf of the Organization would have been evidence the jury could have taken into account concerning his involvement in the conspiracies. Finally, the government introduced evidence that a "drug ledger" at The Castle contained multiple entries in Marquez-Ramos's handwriting.

A reasonable jury could have found Marquez-Ramos guilty of the two conspiracy counts.

The possession with intent to distribute count arose when a police officer observed Marquez-Ramos and others buying what he thought were likely to be drug packaging materials at a store in El Paso. The officer followed the group on a circuitous route back to a house. Later, when Marquez-Ramos left in a white van, the police stopped him. Apparently unaware of the surveillance, Marquez-Ramos lied about where he had been. At the house, officers detected the odor of unburnt marijuana and discovered just under 1,000 pounds of marijuana. A subsequent investigation revealed Marquez-Ramos's fingerprint on an electric scale at the house.

Marquez-Ramos claims that the only real evidence against him was the fingerprint, and invokes what he calls the "fingerprint only doctrine" as requiring a finding that the evidence was insufficient. *See United States v. Lonsdale*, 577 F.2d 923, 926 (5th Cir. 1978); *United States v. Stephenson*, 474 F.2d 1353, 1354-55 (5th Cir. 1973). If any such doctrine ever existed, it no longer does, since both cases cited by Marquez-Ramos were decided under a former rule applying a now-abandoned standard of review for convictions based solely on circumstantial evidence. The two cases are no longer good law for that reason. *Gibson v. Collins*, 947 F.2d 780, 782 (5th Cir. 1991). Regardless, here there was considerably more evidence than Marquez-Ramos's fingerprint alone, as our recounting of the circumstances leading the police to the house indicates. A reasonable jury could have found him guilty on this count.

We now examine the evidence on Marquez-Ramos's distributing marijuana in Mexico knowing it would be unlawfully imported into the United States. *See* 21 U.S.C. § 959. Marquez-Ramos argues that venue in the Western District of Texas was improper, because the government failed to prove that Marquez reentered the United States at the same place as the marijuana entered the country. The statute, however, states only that a defendant is to be tried where he or she enters the United States; it says nothing about the entry point of the controlled substance. *Id.* § 959(c). Marquez-Ramos does not dispute that he entered the United States at El Paso, which is in the Western District of Texas. Accordingly, this argument lacks merit.

*3. Marquez-Ramos's Fourth and Fifth Amendment Claims*

Marquez-Ramos argues that evidence seized in Mexico from the yellow and green house and The Castle should be suppressed, and that he was entitled to a mistrial since some of it had already been presented to the jury before he could have known it was illegally obtained. This evidence included, from The Castle, large quantities of marijuana, a "drug ledger" with Marquez-Ramos's name in

it, and firearms. Recovered from the yellow and green house was evidence involving Liuzza's murder, including her driver's license, a blood-stained axe handle and carpet that tested positive for her DNA, and identification belonging to Marquez-Ramos. At one point Marquez-Ramos made both Fourth and Fifth Amendment arguments for suppression. At oral argument before this court, his counsel explicitly disclaimed reliance on the Fourth Amendment. Thus, we review only for a Fifth Amendment due process violation.

In considering the denial of a suppression motion, we review factual findings for clear error and constitutional conclusions *de novo. United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008). The government argues that Marquez-Ramos waited too long before objecting to the introduction of the evidence, thus subjecting his claim to plain error review. We need not decide the question, as the outcome is clear under either standard.

The factual basis for this claim is Sepulveda's trial testimony, which Marquez-Ramos claims shows American law enforcement agents sat idly by while Mexican agents encouraged Sepulveda to lie and exaggerate his story in order to obtain Mexican search warrants.

Marquez-Ramos's due process argument relies primarily on a precedent from this court. We found that due process was violated when an IRS agent committed a deliberate deception by giving a literally true but misleading answer to a question designed to discover whether an investigation was being undertaken for criminal purposes. *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977). Notably, *Tweel* relied on a case which stated that an "'affirmative misrepresentation'" *by an agent* must be shown, by a clear and convincing standard of proof, in order to demonstrate that the government acted impermissibly. *Id.* (quoting *United States v. Prudden*, 424 F.2d 1021, 1033 (5th Cir. 1970)). Here, Marquez-Ramos does not allege that agents of this country made any representations whatsoever, much less a misrepresentation. At best,

his evidence is that they sat by while Mexican authorities induced a witness to make false statements for use within the Mexican judicial system.

Substantive due process may forbid obtaining a conviction based on law enforcement conduct that "shocks the conscience," when the conduct is "brutal and offensive to human dignity" and is among the "most egregious official conduct." *Stokes v. Gann*, 498 F.3d 483, 485 (5th Cir. 2007) (citation omitted). Even taking as true Marquez-Ramos's allegation that American law enforcement agents were aware that their Mexican counterparts were inducing a witness to lie in order to obtain a Mexican search warrant, that conduct does not sink to the required depths. We find no error in the denial of the motion to suppress.

*4. Marquez-Ramos's Limiting Instruction Issue*

Marquez-Ramos took the stand to testify in his own defense. The district court granted his motion to provide testimony, and thus be cross-examined, only on the conspiracy to kill charge. The district court then told the jury that they should "draw no inference whatsoever" from Marquez-Ramos's "election not to testify as to the other counts."

Before entering into the precise fray between the parties on this issue, we find that the district judge's order was not a proper limit on the examination even of a defendant. "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Fed. R. Evid. 611(b). A criminal defendant who testifies waives the privilege against self-incrimination to the extent of relevant cross-examination. *See Johnson v. United States*, 318 U.S. 189, 195 (1943). In that dated but still authoritative opinion, the Supreme Court quoted Professor Wigmore: a defendant's "voluntary offer of testimony upon any fact is a waiver as to all other relevant facts, because of the necessary connection between all." *Id.* (quoting 8 WIGMORE, EVIDENCE § 2276(2) (3d ed. 1940)). Once

a defendant testified voluntarily, he "waived his fifth amendment right and became obligated, as any other witness, to answer all relevant questions." *United States v. Harper*, 802 F.2d 115, 119 (5th Cir. 1986) (quoting *United States v. Brannon*, 546 F.2d 1242, 1246 (5th Cir. 1977)). The place at which the district judge drew his line for cross-examination, namely, between counts of the indictment, was invalid. The proper line is between what on cross-examination is relevant and irrelevant to the scope of the direct examination.

The government does not here challenge the limitation of its examination. It is this defendant who alleges that another aspect of the district court's actions was prejudicial. Marquez-Ramos claims that the district court's instructions to jurors not to draw any inferences was error and entitled him to a mistrial. The argument is that the comment improperly drew attention to his decision not to testify on the other counts. When the defendant raises an issue such as this at trial, the standard of appellate review for the denial of a mistrial is one of an abuse of discretion. *United States v. Akpan*, 407 F.3d 360, 366 (5th Cir. 2005).

We find no error, as the kind of comment made by the district court has been endorsed by the Supreme Court. *Lakeside v. Oregon*, 435 U.S. 333, 338-39 (1978). While it is impermissible to comment adversely on a defendant's silence, a "cautionary instruction" informing jurors not to draw an adverse inference from a defendant's failure to testify is permissible. *Id.* The unusual events in this trial that underlay the comment do not change the validity of it. There was no abuse of discretion in failing to grant a new trial.

*5. Marquez-Ramos's Sentencing Issue*

Marquez-Ramos next disputes a sentencing enhancement. The district court found Marquez-Ramos to be "an organizer or a leader of a criminal activity that involved five or more participants." *See* U.S.S.G § 3B1.1(a). This increased his Guidelines range by four levels.

Marquez-Ramos argues that he had no decision-making authority and recruited no accomplices. He also alleges that the government did not have evidence of the size of his "share" of the Organization. There was evidence, though, that Marquez-Ramos had major responsibilities on the financial side of the Organization, overseeing the disposition of hundreds of thousands of dollars in cash at a time. There was testimony that he largely ran the Organization while Mario Marquez was in prison during much of the 1990s. Marquez-Ramos was in charge of the group arrested after leaving the El Paso "stash house" during the incident that led to the possession with intent to distribute conviction. Finally, there was testimony pointing to his role as an enforcer for the Organization.

Given this testimony, and the emphasis in the Guideline application note on the "exercise of decision making authority," "nature of participation," "degree of participation in planning or organizing the offense," "nature and scope of the illegal activity," and "degree of authority exercised over others," it was not clear error for the district court to have found that Marquez-Ramos met the criteria for the leadership enhancement. We affirm Marquez-Ramos's sentence.

## III. CONCLUSION

For the foregoing reasons, the convictions and sentences of the three defendants are AFFIRMED.