# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 24, 2014

Lyle W. Cayce
Clerk

No. 13-40203

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

JESUS GREGORIO LOPEZ, also known as Goyo; ROBERTO GARZA;
RAMON ZAMORA,

Defendants–Appellants

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 2:12-CR-418-4

Before HIGGINBOTHAM, JONES, and PRADO, Circuit Judges.

PER CURIAM:*

Defendants–Appellants Jesus Gregorio Lopez ("Lopez"), Roberto Garza ("Garza"), and Ramon Zamora ("Zamora") were indicted for conspiracy to possess with intent to distribute more than 1,000 kg of marijuana in violation of 21 U.S.C. §§ 841(a)(1)(A), 841(b)(1)(A), and 846. After a jury trial, all three were convicted and received lengthy prison sentences. On appeal, Lopez, Garza, and Zamora allege a variety of errors were committed at trial. In

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-40203

addition, Garza and Zamora challenge their sentences. After careful review of the record and relevant case law, we affirm their convictions and sentences.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background[1]

This appeal concerns a conspiracy to smuggle large quantities of marijuana from Mexico into the United States, involving at least a dozen individuals, from 2003 to 2012. At trial, the Government primarily relied on testimony from the following individuals, all of whom admitted to being involved in the drug conspiracy: Jesus Marroquin; Ronny Rice; Edward David Mata; Richard Patton; Servando Guerra; Luis Andreas Longoria; Jose Maria Carbajal, Jr.; Rene Salazar, Jr.; Jose Figueroa; and Adrian de la Garza. The Government also offered testimony from numerous law enforcement officials involved in investigating the conspiracy.

Jose Maria Carbajal, Jr. ("Carbajal") began trafficking marijuana in the mid-to-late 1980s. Initially, he carried 20-pound loads of marijuana in backpacks through Encino and Falfurrias. Carbajal later met another supplier and began moving larger loads of approximately 150 to 200 pounds. Carbajal and his associates, Edward Mata ("Mata") and Richard Patton ("Patton"), used ATVs and night-vision goggles to trespass through ranches near the Falfurrias Border Patrol Station to smuggle the marijuana past the checkpoint.

Sometime around 2005, Lopez learned of Carbajal's operation, and he approached Carbajal to offer Carbajal the use of his ranch, Las Carolina Ranch ("Carolina"). Before beginning their working relationship, Lopez asked Carbajal to pass a test: he wanted Carbajal to move some marijuana belonging

---

[1] Because this appeal involves a challenge to the sufficiency of the evidence, we review the facts "in the light most favorable to the jury verdict, including all reasonable inferences and credibility choices." *United States v. Pierre*, 958 F.2d 1304, 1310–11 (5th Cir. 1992) (en banc). We discuss any relevant disputes about the facts in the appropriate sections below. *See infra* subparts III(B) and IV(E).

to Damien Solis, a drug trafficker, through Lopez's ranch past the Falfurrias Border Patrol Station. Carbajal passed the test, and he introduced Jesus Marroquin ("Marroquin") to Lopez. Carbajal told Lopez that he and Marroquin would begin using Carolina. For the next seven years, Marroquin and Carbajal moved loads of marijuana through ranches including Carolina, transporting more than 25,000 pounds of marijuana into the United States.

In 2006, Lopez asked Carbajal to come to a meeting with Garza. Garza had been trafficking in marijuana since at least 2004, using an employee, Ronny Rice ("Rice"), to drive shipments into the United States. Soon after the meeting between Lopez, Carbajal, and Garza, Garza's brother, Alex Garza, began delivering shipments to Carolina. According to Carbajal's trial testimony, "[t]hat's where the big quantities started coming in." The Garzas and other distributors dropped off 500-to-1,500-pound loads of marijuana at Carolina. Phone records revealed that Lopez was in frequent contact with Carbajal and Garza. As the operation grew, Lopez decided to build an outhouse with a false bottom on his ranch for the smugglers to conceal the marijuana. The outhouse could hold between 1,000 and 1,500 pounds of marijuana.

Carbajal also used other ranches in addition to Carolina. He formed a relationship with Zamora, who was employed at Baluarte Ranch, which was also near the Falfurrias checkpoint.[2] Zamora helped Carbajal and two of Carbajal's associates to get jobs at Baluarte Ranch. Carbajal and others then began smuggling marijuana through Baluarte Ranch; Zamora would help them gain access the ranch and provided them places to store the marijuana. They stored marijuana at Baluarte Ranch as often as two to three times a week for three years and at least fifty times. Zamora also served as a lookout against

---

[2] The parties and the record refer to the ranch where Zamora worked as both Baluarte Ranch and the Hector Lopez Ranch. Both names identify the same property though, and for the sake of consistency, we refer to the property as Baluarte Ranch.

law enforcement officers.  The conspiracy entered its most successful phase once Zamora started working with Carbajal.

While investigating the conspiracy, the Government seized marijuana on a number of occasions between 2003 and 2012.  They recovered marijuana from a number of Carbajal's employees, Ronny Rice, and from Carbajal and Garza themselves.  Among the largest amounts recovered were 3,000 pounds from Garza's home, 2,000 pounds hidden in a truck Patton had abandoned, and 1,400 pounds from a trailer.

Carbajal was arrested in early 2011.  Law enforcement officials had begun to suspect Lopez's involvement in the conspiracy, and they interviewed him after Carbajal was arrested.  They later returned to his ranch to execute a search warrant, and they discovered an illegal alien, Marvin Ruiz ("Ruiz"), whom Lopez employed as a ranch hand.  Lopez was charged with harboring an illegal alien.  When the Government interviewed Ruiz, he told them that he did not have any knowledge of illegal activity at the ranch.  The parties dispute when Lopez was made aware of this statement.  *See infra* subpart III(D)(2). Lopez agreed to allow the Government to release Ruiz from custody and remove him from the United States before Lopez's conspiracy trial.

## B.    Procedural Background

In 2012, Lopez, Zamora, Garza, and nine coconspirators were indicted for conspiracy with intent to distribute more than 1,000 kg of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.  Lopez, Zamora, and Garza went to trial, and the jury found all three guilty.  Lopez was sentenced to 292 months' imprisonment with 5 years of supervised release.  Zamora was sentenced to 360 months in prison, followed by 5 years of supervised release. Garza was sentenced to life in prison to be followed by 10 years of supervised release.

No. 13-40203

## II.  JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III.  DISCUSSION

Lopez, Garza, and Zamora each raise a number of issues on appeal.  We address these issues in the following order.  First, Zamora argues the district court erroneously denied his motion to suppress evidence.  Second, both Zamora and Lopez challenge the sufficiency of the evidence supporting their convictions.  Third, Garza argues there was a material variance between the charge in the indictment and the evidence at trial.  Fourth, Lopez claims the Government committed a *Brady* violation because it failed to timely disclose exculpatory evidence.  Finally, both Garza and Zamora argue that the district court erred in calculating their sentences.  We address each issue in turn.

### A.     Zamora's Motion to Suppress

#### 1.  Standard of Review

When reviewing a district court's denial of a motion to suppress, this Court reviews "factual findings for clear error and legal conclusions regarding the sufficiency of the warrant or the reasonableness of an officer's reliance on a warrant *de novo*."  *United States v. Allen*, 625 F.3d 830, 834 (5th Cir. 2010).  We "view the evidence in the light most favorable to the prevailing party, in this case, the United States."  *Id.*

#### 2.  Analysis

When reviewing the denial of a motion to suppress evidence under the Fourth Amendment, this Court conduct an alternative test.  *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005).  First, we consider whether the good-faith exception applies, that is, whether "the officer executing the warrant relied on it in good faith."  *Id.*  "For the good-faith exception to apply, the executing-officer's     reliance     on     the     issuing-judge's     probable-cause

determination and the technical sufficiency of the warrant must have been objectively reasonable." *Id.* at 358. A warrant will ordinarily establish good faith on the part of the officer executing the warrant. *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988). But the warrant will not establish good faith if the affidavit supporting the warrant is bare bones, meaning it is "so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable." *Id.* (citation and internal quotation marks omitted). If the good-faith exception applies, the inquiry ends; if this Court does not find good faith, we will next consider "whether the warrant was supported by probable cause." *Gibbs*, 421 F.3d at 357 (citation and internal quotation marks omitted). Even if both of these tests are met, this Court still applies a harmless error analysis, which asks "whether the trier of fact would have found the defendant guilty beyond a reasonable doubt [if the evidence had been suppressed]." *United States v. Willingham*, 310 F.3d 367, 372 (5th Cir. 2002) (alteration in original) (citation and internal quotation marks omitted).

Zamora argues that the district court erred in denying his motion to suppress because the search warrant used to search his house listed the wrong address.[3] He points out that the search warrant authorized the search of 2932 Fernando Salinas, Rio Grande City, Texas, but that the address of his home and the house the agents actually searched is 2930 Fernando Salinas, Rio Grande City, Texas. Zamora claims that because of the incorrect address, the warrant did not give the officers a basis for searching any residence other than 2932 Fernando Salinas. He also claims the good-faith exception does not apply

---

[3] The agents who searched Zamora's home found "a grenade, 46 firearms, various magazines for the firearms, two ballistic vests, a lot of ammunition, about 4 ounces of marijuana, a pair of night vision goggles, [a] steel baton, handcuffs, [an automobile], and miscellaneous documents." At trial, the Government argued that finding the night-vision goggles at Zamora's home corroborated the coconspirators' testimony that they used night-vision goggles to get around the ranches while transporting drugs at night.

because the affidavit failed to state probable cause for the agents to search 2930 Fernando Salinas.  The Government responds that "[t]he district court's findings of fact, which were based on testimony offered at the suppression hearing, establish both the validity of the warrant and the agents' reasonable reliance on it."  According to the Government, the warrant was not facially invalid because it accurately described the premises to be searched, and the agents' reliance on the warrant was objectively reasonable.

We hold that the district court did not err when it denied Zamora's motion to suppress because the good-faith exception applies.  We focus on whether the warrant describes the premises to be searched with sufficient specificity to ensure that the officers could locate the premises without searching the wrong premises.  *See Darensbourg*, 520 F.2d at 987 ("It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended.  The test is one of reasonableness, and [t]echnical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." (alteration in original) (citations and internal quotation marks omitted)).  An incorrect address is not necessarily fatal.

Indeed, this Court has previously upheld searches conducted pursuant to warrants with an incorrect house number, the wrong street name, and even the incorrect city.  *See, e.g.*, *United States v. Gordon*, 901 F.2d 48, 50 (5th Cir. 1990) (even though the street name was wrong on the warrant, the good-faith exception applied because the defect was not apparent from simply looking at the warrant, "the affiant [who was] the executing officer . . . had recently viewed the location in question," and "there was no possibility the wrong premises would be searched" (internal quotation marks omitted)); *United States v. Avarello*, 592 F.2d 1339, 1344 (5th Cir. 1979) (affirming denial of the motion to suppress where the warrant listed the wrong city because the

7

description of the premises allowed "the executing officers [to] locate and identify the premises to be searched with reasonable effort"); *United States v. Darensbourg*, 520 F.2d 985, 987 (5th Cir. 1975) (collecting cases where the Fifth Circuit has upheld the denial of a motion to suppress when the address was incorrect).

Here, the officers initially set out to execute an arrest warrant for Zamora, which listed his address as 2930 Fernando Salinas.  When they arrived at the street, they were unable to find 2930, but they saw Zamora's car parked outside a house that had an electrical box labeled 2932.  The agents executed the arrest warrant, and then sought a search warrant, which listed the address of the home as 2932 Fernando Salinas.  The search warrant also gave a physical description of the home, noted that Zamora had been found inside the home, and stated that 2932 appeared on the home's electrical box.

The district court found that the warrant accurately described Zamora's home so that the officers would not risk searching the wrong home.  Zamora does not dispute the accuracy of the description of his home in the warrant; he only focuses on the incorrect address.  But, as the cases above demonstrate, an incorrect address in a search warrant does not automatically invalidate the search.  Because the warrant accurately described Zamora's home, the officers were able to find his house and there was little risk that they would inadvertently search the wrong location.  Thus, the district court correctly denied Zamora's motion to suppress.

**B.   Sufficiency of the Evidence (Lopez and Zamora)**

1.  Standard of Review

Both Lopez and Zamora admit that they failed to move for a judgment of acquittal on the grounds that the Government had not presented sufficient evidence to convict them.  This Court reviews unpreserved challenges to the sufficiency of the evidence for plain error.  *United States v. Delgado*, 672 F.3d

320, 330 (5th Cir. 2012) (en banc).  Under plain error review, the defendant "must show: (1) an error, (2) that is plain, (3) and that affected his substantial rights." *United States v. Garcia–Gonzalez*, 714 F.3d 306, 315 (5th Cir. 2013) (citation omitted).  Even if the Defendant–Appellant satisfies those criteria, this Court "will exercise discretion to correct the error only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration in original) (citation and internal quotation marks omitted).

This Court has previously "described the standard of review for unpreserved insufficiency claims in the most exacting language, stating that such a claim 'will be rejected unless the record is *devoid of evidence* pointing to guilt or if the evidence is so tenuous that a conviction is shocking.'" *Delgado*, 672 F.3d at 330–31 (quoting *United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007) (emphasis added) (internal quotation marks omitted)).  "Put simply, to satisfy the second prong of the plain-error test, [the defendant] must demonstrate not just that the government's evidence of conspiracy was insufficient, but that it was *obviously* insufficient." *Id.* at 331.  This Court reviews "the evidence in the light most favorable to the jury verdict, including all reasonable inferences and credibility choices." *United States v. Pierre*, 958 F.2d 1304, 1310–11 (5th Cir. 1992) (en banc).

2.  Analysis

"To prove conspiracy to possess and distribute a controlled substance, the government must show beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate narcotics laws; (2) the defendant's knowledge of the agreement; and (3) his voluntary participation in the conspiracy." *United State v. Valdez*, 453 F.3d 252, 256–57 (5th Cir. 2006) (footnote omitted).  The Government cannot prove a conspiracy merely by showing a defendant's presence at a crime scene or association with conspirators.  *Id.* at 257.  But "[a] conspiracy may be inferred from

circumstantial evidence." *United States v. Villegas–Rodriguez*, 171 F.3d 224, 228 (5th Cir. 1999). The Government is not required to prove "that each defendant knew of every detail of the conspiracy, only that each knew of its essentials." *Id.* Importantly for this case, "a defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain unless the coconspirator's testimony is incredible." *Id.* "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994).

### a. Lopez

Lopez's main argument about the sufficiency of the evidence is that it was uncorroborated and unreliable. Specifically, he complains that

> The only evidence offered by the Government that [Lopez] knowingly permitted the use of Las Carolina Ranch to store and transport marijuana past the Falfurrias border patrol checkpoint was the self-serving testimony of the "low-life" "boss" and self-professed "pothead" Jesus Carbajal and his crew of terminally high drug couriers who had each entered a guilty plea and given testimony against [Lopez] in hopes of receiving a more lenient sentence.

Lopez argues that the Government only offered "assumptions stacked upon inferences and inferences stacked upon inferences," and thus failed to prove he knew that Carbajal was actually transporting drugs through his ranch. In response, the Government argues that Lopez ignores the standard of review and fails to make the requisite credibility inferences in favor of the jury's verdict. The Government claims that the record provides "overwhelming evidence of Lopez's guilt."

We hold that the district court did not plainly err in entering a guilty judgment because our review of the record demonstrates that there was more

No. 13-40203

than sufficient evidence of Lopez's guilt. Carbajal testified that Lopez approached him and offered to allow Carbajal to use his ranch to help transport the drugs past the border-patrol station. Carbajal also testified that Lopez arranged a meeting between the two of them and Garza, and that after that meeting, the smuggling business expanded significantly. The jury also heard testimony from a number of other witnesses describing Lopez's involvement in the smuggling conspiracy. The coconspirators testified that they told Lopez they were going to drop marijuana off at his ranch, that Lopez was present during the loading and unloading of the marijuana, and that they witnessed Lopez and Carbajal meeting. Witnesses also told the jury that Lopez was present while loads of marijuana were being moved. In addition, the Government presented evidence that Lopez ordered the construction of an outhouse on his ranch so that the smugglers could hide the marijuana they were transporting. Once law enforcement began to dismantle the conspiracy, Lopez then concealed the outhouse. Lopez was also paid for his part of the conspiracy.

To counteract the weight of this testimony, Lopez points to his testimony at trial. He testified that he was a legitimate business man, who had been steadily employed his whole life. He also testified that he rented part of his ranch to Carbajal, and he thought Carbajal was moving barrels of hay. He denied ever talking to Carbajal about transporting drugs or being paid for drugs being stored on his ranch. But, it was the jury's job to make credibility determinations, and on appeal, this Court makes all reasonable credibility choices in favor of the jury verdict. *Pierre*, 958 F.2d at 1310–11.

Considering all of this, the record was not devoid of evidence pointing to guilt, and so we affirm on this issue.

11

### b. *Zamora*

Zamora's primary argument regarding the sufficiency of the evidence is that the testimony was uncorroborated. He claims that the Government tried to corroborate the witness testimony with the ATV and night-vision goggles that were used to smuggle drugs and were seized from Zamora's home. But Zamora claims he did not own or control the ATV and that he did not use the night-vision goggles. Further, he argues that coconspirator testimony was incredible as a matter of law because the witnesses gave conflicting dates, ranging from 2005 to 2009, when testifying about when Zamora joined the conspiracy. The Government responds that Zamora's arguments completely ignore the appropriate standard of review; applying the correct standard of review, the Government argues, the evidence is not plainly insufficient.

We agree with the Government that the evidence supporting Zamora's conviction was not plainly insufficient. First, Zamora's arguments that the uncorroborated witness testimony is insufficient as a matter of law are unavailing. As discussed above, *see supra* subpart III(B)(2), this Court has previously held that the Government is entitled to prove its case based on uncorroborated testimony from cooperating witnesses unless the testimony is incredible as a matter of law. *See Villegas–Rodriguez*, 171 F.3d at 228. Zamora does not otherwise attempt to argue that the testimony was incredible.

Second, a review of the record shows that there was evidence to support the jury's conviction. Zamora worked at Baluarte Ranch, and he secured jobs for Carbajal and other coconspirators to further the smuggling operation. Several witnesses testified that Zamora let them into Baluarte Ranch when they arrived with shipments. The jury also heard testimony that Zamora allowed other smugglers to store marijuana on the ranch or at his home. There was also testimony that Zamora was a law enforcement lookout and that Zamora personally transported loads off of Baluarte Ranch. Further, Zamora

was paid $1,000 per load, earning $30,000 to $40,000 for his work with Carbajal.

Considering all of this testimony, we cannot say that the record is devoid of evidence to support the jury's verdict. *See Delgado*, 672 F.3d at 330–31. Thus, under plain-error review, the jury had sufficient evidence to find Zamora guilty.

**C.    Variance Between the Indictment and Evidence at Trial (Garza)**

At the outset, we note that Garza's brief is somewhat inconsistent in how it frames this issue. Garza labels it a challenge to the sufficiency of the evidence in the headings of his brief. But, in the body of his brief, he discusses the factors this Court uses to determine whether there has been a variance between the indictment and proof at trial, and he then applies those factors to his case. Thus, despite the headings in his briefing, we will construe this as a variance argument.

1.  Standard of Review

"The question whether the evidence establishes the existence of one conspiracy (as alleged in the indictment) or multiple conspiracies is a fact question within the jury's province." *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007). This Court affirms the jury's finding of a single conspiracy "unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." *Id.* (internal quotation marks omitted). Even when the Court finds a variance, the Court will "reverse only if the variance prejudiced the defendant's substantial rights." *Id.* The defendant's substantial rights are not affected "as long as the government establishes the defendant's involvement in at least one of the proved conspiracies." *Id.* at 770.

2. Analysis

"A material variance occurs 'when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense.'" *Id.* at 769 (quoting *United States v. Delgado*, 401 F.3d 290, 295 (5th Cir. 2005)).  Determining whether there is a variance between the indictment, which charged a single conspiracy, and the proof at trial, which Garza alleges proved multiple conspiracies, requires counting the conspiracies. "The principal considerations in counting the number of conspiracies are (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings." *United States v. Morrow*, 177 F.3d 272, 291 (5th Cir. 1999) (per curiam).

Garza essentially argues that the Government only proved a series of smaller conspiracies instead of the single, overarching conspiracy charged in the indictment.  He points out that Carbajal developed his smuggling scheme before Garza became involved with the conspiracy.  Although he admits that several people used Carbajal's system to transport marijuana from Mexico to the United States, Garza argues that there was not a single conspiracy because they were not sharing profits.  The Government responds that everything Garza admits was sufficient for the jury to find a single conspiracy.  Further, the Government argues that evidence clearly establishes a single conspiracy.

After reviewing the evidence adduced at trial, we hold that there was not a material variance between the indictment and the proof at trial.  Applying the relevant considerations here, the evidence was sufficient for reasonable jurors to find a single conspiracy beyond a reasonable doubt.  This Court has previously defined having a "common goal" broadly, finding a common goal where "[t]he overall objective or goal was for everyone in the conspiracy to profit from the illicit purchase and selling of cocaine." *United States v. Morris*,

14

46 F.3d 410, 415 (5th Cir. 1995); *see also Morrow*, 177 F.3d at 291 (describing the conspirators' common goal as "deriv[ing] personal gain from the sale of mobile homes through the submission of false loan information"). Here, the jury could reasonably have found that the conspirators had a common goal of smuggling marijuana past the Falfurrias Border Patrol checkpoint for personal gain. Even Garza admits that all of the individuals involved were seeking their own profit from the illegal smuggling and sale of marijuana. While Garza emphasizes that the coconspirators were in competition with each other after smuggling the marijuana past the border, that fact does not preclude finding a common goal. *United States v. Ross*, 58 F.3d 154, 158 (5th Cir. 1995).

Next, the nature of the scheme shows a single conspiracy. This Court has explained that, in examining the nature of the scheme, we do not look at charts or diagrams of wheels or chains in a conspiracy; instead, the Court conducts a "functional and substantive analysis." *Morris*, 46 F.3d at 415. "Where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture, [or] where there are several parts inherent in a larger common plan . . . , the existence of a single conspiracy will be inferred." *United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982). Here, the coconspirators had coordinated drop-off times, and marijuana from different suppliers was stored and transported together. Viewed in the light most favorable to the verdict, this evidence shows that the several dealers who used Carbajal's smuggling network were part of his larger common plan, reflecting a single conspiracy.

Finally, the overlapping participants show a single conspiracy. "Where the memberships of two criminal endeavors overlap, a single conspiracy may be found. There is no requirement that every member must participate in every transaction to find a single conspiracy. Parties who knowingly

15

participate with core conspirators to achieve a common goal may be members of an overall conspiracy." *United States v. Richardson*, 833 F.2d 1147, 1154 (5th Cir. 1987). The evidence at trial established that Lopez introduced Garza to Carbajal at a meeting at Lopez's ranch. After that meeting, Garza and his brother began moving marijuana through Carbajal's smuggling system. Based on this testimony, the jury could reasonably have concluded that Garza was interacting with Carbajal, the core member of the conspiracy, to achieve the conspiracy's common goal of smuggling marijuana past the border-patrol station for profit. Thus, we conclude that there was not a material variance because the proof at trial proved the single conspiracy charged in the indictment.

## D.　*Brady* Violation (Lopez)

### 1. Standard of Review

This Court "generally review[s] whether the government violated *Brady de novo*, although even when reviewing a *Brady* claim *de novo*, [the Court] must proceed with deference to the factual findings underlying the district court's decision." *United States v. Brown*, 650 F.3d 581, 589 (5th Cir. 2011) (citations and internal quotation marks omitted).

### 2. Analysis

"There are three components of a true *Brady* violation": (1) the evidence at issue, whether exculpatory or impeaching, must be favorable to the accused; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material for purposes of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," meaning the probability is "sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (internal quotation marks omitted).

16

No. 13-40203

Lopez argues that the Government violated *Brady* because it failed to disclose an exculpatory statement his ranch hand, Ruiz, made to the Government.  Ruiz was arrested for being in the country illegally, and he told law enforcement agents that he had no knowledge of any illegal activity at Lopez's ranch.  After Ruiz made that statement but before the trial in this case, the Government sought to remove Ruiz from the country; Lopez agreed, and Ruiz was deported.  Lopez claims that he did not find out about Ruiz's statement until trial; according to Lopez, the Government claimed it had complied with its *Brady* obligations and denied Ruiz had made any exculpatory statements.  Lopez argues that this was material because, at trial, several witnesses pointed to Ruiz's role in the conspiracy, and had Lopez been able to question Ruiz, he could have proven his innocence.  In response, the Government urges us to decline to review this claim because Lopez failed to raise it before the district court.

We decline to reach the merits of Lopez's *Brady* claim because he failed to raise it before the district court.  The question of what Lopez knew about Ruiz's statement and when he knew it is the type of "fact-based judgment[] that cannot be adequately first made on appellate review [and] is why *Brady* challenges must be brought to the district court's attention, winnowed by the trial judge, and made part of the record through a motion for a new trial." *See United States v. Rice*, 607 F.3d 133, 142 (5th Cir. 2010) (citing *United States v. Gonzales*, 436 F.3d 560, 580 (5th Cir. 2006)).  Here, it is not clear from the record whether Ruiz's statement was actually suppressed.  At a pretrial conference, Lopez's attorney stated, "[The prosecutor in Ruiz's case] advised us at [the time of Ruiz's expedited departure hearing] that [Ruiz] had given an exculpatory statement."  Lopez's attorney then said that the agent to whom Ruiz made the statement "has forgotten about that statement or has denied that statement existed."  That same agent, however, testified to the statement

17

at trial, and Lopez never explains how we are supposed to reconcile the conflict between Lopez's attorney's statement in the pretrial conference and this testimony at trial. Thus, because it is impossible to determine whether the statement was suppressed based on the record before us, we hold that Lopez has waived this issue and decline to reach the merits of Lopez's *Brady* claim.

## E.    Calculation of Guideline Ranges (Garza and Zamora)

### 1.  Standard of Review

Under *Gall v. United States*, 552 U.S. 38 (2007), appellate courts take a two-step approach in reviewing sentences. *See id.* at 51. This Court will first review the sentence to ensure that it is procedurally sound and will then consider the substantive reasonableness of the sentence under an abuse of discretion standard. *Id.* Nothing in this analysis, however, "purport[s] to alter [this Court's] review of the district court's construction of the Guidelines or findings of fact." *United States v. Cisneros–Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). Thus, this Court reviews factual findings related to sentencing for clear error: "[t]here is no clear error if the district court's finding is plausible in light of the record as a whole." *Id.* (footnote and internal quotation marks omitted). The district court may find the "facts relevant to a defendant's Sentencing Guidelines range by a preponderance of the evidence." *United States v. Harper*, 448 F.3d 732, 735 & n.2 (5th Cir. 2006).

Drug-quantity determinations are factual determinations. *United States v. Ramirez*, 271 F.3d 611, 612 (5th Cir. 2001). Whether a defendant is a minimal or minor participant is also a factual determination. *United States v. Pofahl*, 990 F.2d 1456, 1485 (5th Cir. 1993).

### 2.  Analysis

#### a.  Garza

Garza argues the district court committed two errors in sentencing him. First, he claims the district court erred in calculating the drug quantity

attributable to him.  Second, he argues that the district court erred in relying on a temporally distant crime—his 1994 marijuana-possession conviction — when calculating his criminal history.  The Government responds that the record supports the district court's finding that Garza is responsible for at least 30,000 kg of marijuana.  The Government also argues that Fifth Circuit precedent forecloses Garza's argument about the calculation of his criminal history.

> The drug quantity for sentencing purposes
>
> includes both drugs with which the defendant was directly involved, and drugs that can be attributed to the defendant in a conspiracy as part of his "relevant conduct" under § 1B1.3(a)(1)(B) of the Guidelines.  Relevant conduct for conspiratorial activity is defined in § 1B1.3(a)(1)(B) as "all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity."

*United States v. Carreon*, 11 F.3d 1225, 1230 (5th Cir. 1994) (citation omitted). "A district court may consider estimates of the quantity of drugs for sentencing purposes." *United States v. Cooper*, 274 F.3d 230, 240 (5th Cir. 2001) (internal quotation marks omitted).  The PSR is considered reliable evidence for sentencing purposes.  *United States v. Clark*, 139 F.3d 485, 490 (5th Cir. 1998) (per curiam). "The defendant bears the burden of showing that the information in the PSR relied on by the district court is materially untrue." *United States v. Valencia*, 44 F.3d 269, 274 (5th Cir. 1995).

We hold the district court did not clearly err in calculating the drug quantity used as the basis of Garza's sentence.  First, some of Garza's arguments rely on his contention that the evidence at trial only proved several smaller conspiracies, not a single conspiracy.  But, we have already rejected Garza's variance argument, *see supra* subpart III(C), and a coconspirator can be held reasonable for all reasonably foreseeable relevant conduct.  *See* U.S.S.G. § 1B1.3(a)(1)(B).  Garza does not appear to argue that the acts of other

suppliers were not foreseeable; he simply argues that they cannot be attributed to him because he was not part of the overarching conspiracy.

Most importantly though, Garza's arguments ignore the testimony that clearly linked Garza to more than 30,000 kg of marijuana. Ronny Rice, who worked as a driver for Garza and helped transport drugs across the border, testified that from 2005 to 2010, he carried two to five loads per week, with each load weighing 100 to 200 pounds. Even assuming the fewest loads at the lowest weight, this means Rice carried approximately 23,587 kg for Garza from 2006 to 2010. And, this does not include the more than 7,000 kg the Government seized from other members of the conspiracy—1,365 kg of which was found at Garza's home. Garza has not offered any evidence to show that this information in the PSR is materially untrue. *See Valencia*, 44 F.3d at 274. For these reasons, the district court did not err in calculating the drug quantity used as the basis of Garza's sentence.

Next, Garza argues that the district court erred when it used a "temporally remote conviction" to calculate his criminal history. The Guidelines allow a district court to consider "any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense." U.S.S.G. § 4A1.2(e)(1). "So long as the defendant was incarcerated within the statutory time period, the prior sentence will be counted in the criminal history score—regardless of when the sentence was 'imposed.'" *United States v. Arnold*, 213 F.3d 894, 895–96 (5th Cir. 2000). Garza was released from prison for the marijuana offense in 1997. This is within fifteen years from when he commenced the conspiracy offense (2006). Garza himself acknowledges that Fifth Circuit case law forecloses this argument, and so the district court did not err in calculating his sentence. Thus, we affirm Garza's sentence.

No. 13-40203

### b. Zamora

Zamora argues the district court committed three errors in calculating his sentence: (1) the district court erred in calculating the relevant drug quantity; (2) the district court erred in enhancing his sentence for firearm possession; and (3) the district erred when it failed to reduce his sentence because he was a minor participant.  The Government responds that Zamora can be held responsible for all reasonably foreseeable conduct of his coconspirators.  Given the scope of the conspiracy, the Government argues that it was reasonably foreseeable that more than 30,000 kilograms of marijuana would be smuggled into the United States.  Further, the Government argues there was no error in giving Zamora the enhancement for possession of a firearm because Zamora had actual knowledge of the facts the district court used as the basis of the enhancement.  Finally, the Government claims the district court correctly refused to give Zamora a minor-participant adjustment because Zamora played an important role in the conspiracy and was responsible for "[t]he most successful years" of the conspiracy.

We conclude the district court did not err in calculating the drug quantity used as the basis for Zamora's sentence.  Zamora relies on *Carreon* to argue that the district court was required to make express findings of the amount of drugs attributable to him, based on his specific role in the conspiracy.  But, *Carreon* is distinguishable from this case in several ways.  First, in *Carreon*, the district court had attributed the *entire* quantity of drugs involved in the conspiracy to the defendant without any explanation.  11 F.3d at 1231.  Here, the PSR estimated the conspiracy was responsible for more than 100,000 kg of marijuana but used less than a third of that amount to calculate Zamora's sentence.  *Cf. United States v. Fernandez*, 559 F.3d 303, 323–24 (5th Cir. 2009) (affirming a sentence where the drug quantity attributed to the defendant was "hal[f] the drug amount attributed to the conspiracy as a whole").  Further, the

21

Court in *Carreon* specifically "rejected the proposition that a court must make a 'catechismic regurgitation of each fact determined'; instead, [this Court] allowed the district court to make implicit findings by adopting the PSR." *Carreon*, 11 F.3d at 1231. Here, the district court made this implicit finding. At the sentencing hearing, Zamora objected to the drug quantity, and the district court heard arguments from both parties before overruling the objection because Zamora was "responsible for the acts of that conspiracy."

Moreover, the evidence at trial also supports the district court's estimate of the drug quantity attributable to Zamora. *See Fernandez*, 559 F.3d at 323 (affirming sentence where the evidence showed the defendant's "knowledge of the breadth of the conspiracy"); *United States v. Duncan*, 191 F.3d 569, 575–76 (5th Cir. 1999) (affirming sentence where the "foundation for the findings in the PSR regarding the foreseeability of the drug quantities involved [was] manifestly apparent"). Mata testified that he and others transported loads to Baluarte Ranch as often as two to three times per week for three years and at least fifty times; he also testified that each load weighed between 350 and 450 pounds. At the low end, this means 7,937 kg of marijuana were transported through Baluarte Ranch; at the high end, 95,526 kg of marijuana were smuggled through the ranch. Further, Carbajal specifically testified that the most successful years of the conspiracy were the years he worked with Zamora. As the PSR noted, several coconspirators identified Zamora as the person who helped them smuggle marijuana through Baluarte Ranch and scouted for law enforcement. Law enforcement officers also seized specific loads of marijuana on their way to Baluarte Ranch, with at least one load totaling more than 1,000 kg.

Finally and perhaps most importantly, Zamora bears the burden of showing that the information in the PSR was materially untrue. *See Valencia*, 44 F.3d at 274. Zamora argues he did not start working at the Baluarte Ranch

until 2009, so he cannot be held responsible for any drugs smuggled before that date. But there was testimony at trial that Zamora joined the conspiracy as early as 2005 or 2006. Based on this testimony, it was plausible for the district court to conclude Zamora had been involved with the conspiracy for longer than he claimed, and thus was responsible for a greater quantity of drugs. In the absence of a more specific objection or additional evidence from Zamora showing that the information in the PSR was materially untrue, he has not met his burden of showing the district court erred in relying on the PSR. Thus, we hold the district court did not clearly err in finding Zamora responsible for 30,000 kg of marijuana.

We also affirm the enhancement for possession of a firearm. The PSR recommended the enhancement based on weapons that officers seized when they searched Zamora's home. The district court concluded that the evidence was insufficient to show that those weapons were used in the offense, but still applied the enhancement because the evidence at trial showed Zamora carried a handgun. Zamora argues this was error; he claims he did not have proper notice because the enhancement was based on facts not in the PSR. But this Court has previously held that "if the defendant has actual knowledge of the facts on which the district court bases an enhancement or a denial of a reduction, the Sentencing Guidelines themselves provide" sufficient notice. *United States v. Marmolejo*, 89 F.3d 1185, 1201 (5th Cir. 1996) (internal quotation marks omitted). Zamora freely admits that he possessed a handgun, and he acknowledges *Marmolejo* forecloses this argument. Thus, the district court did not err in imposing the firearm enhancement.

Finally, we also hold that the district court did not err in deciding not to award a minor-participant adjustment. Zamora argues he played only a minor role in the conspiracy, allowing drug runners access to the Baluarte Ranch and "perhaps, assist[ing] in unloading one of the shipments." But, the evidence

No. 13-40203

plausibly supported a more extensive role in the conspiracy, and Zamora ignores Carbajal's testimony that "[t]he most successful years were when I started working [with Zamora] helping me out." *See supra* subpart III(B)(2)(b). Zamora's involvement in the conspiracy was more than a single, isolated incident, and he was well-compensated for his work. *See Pofahl*, 990 F.2d at 1485 (affirming district court's denial of a minor-participant reduction where defendant acted as a courier at least twice, recruited an individual to participate in the conspiracy, and received large payments for his work); *United States v. Bethley*, 973 F.2d 396, 401 (5th Cir. 1992) ("We have held that a 'mule' or transporter of drugs may not be entitled to minor or minimal status."). Thus, we conclude the district court did not err in sentencing Zamora.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM.

24