# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
April 6, 2023

Lyle W. Cayce
Clerk

No. 21-40574

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

MATTHEW LEE SEPULVEDA,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:19-CR-2120-1

Before WIENER, HIGGINSON, and WILSON, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:

Matthew Lee Sepulveda was convicted by a jury of depriving two persons of their constitutional rights under color of law in violation of 18 U.S.C. § 242. The district court sentenced Sepulveda to concurrent terms of 12 and 360 months of imprisonment and ordered Sepulveda to pay $10,000 in restitution to one of the victims. Sepulveda now appeals. For the reasons stated below, we AFFIRM Sepulveda's conviction and sentence.

No. 21-40574

I.

Sepulveda served as a police officer with the Progreso Police Department. The government alleged that in June 2019, Sepulveda sexually assaulted two young men inside the police station. At trial, the victims testified about the assaults, and the government introduced evidence corroborating their accounts.

A.

On the evening of June 28, 2019, Sepulveda pulled over a 2007 Tahoe for going five miles per hour over the speed limit. The driver, C.L., was a twenty-year-old man. Sepulveda arrested C.L. for driving without insurance or a license. After another officer arrived at the scene, Sepulveda told C.L. that he would also be charged with resisting arrest. At about 11:40 p.m., Sepulveda drove C.L. to the station.

At the station, among other questions, Sepulveda asked C.L. whether he had a Social Security number. When C.L. said that he did not, Sepulveda said that he would be deported.

Sepulveda took C.L. to a cell and told him to pull down his shorts for a pat down. C.L. testified that after he complied, Sepulveda said "I see you have nothing." Another police officer testified that during a pat down, the procedure is to touch the suspect over the waist, not to insert fingers into the waistband or underwear.

C.L. asked Sepulveda to let him go, and Sepulveda responded that he would "think about it" and would check on C.L.'s truck. When Sepulveda returned, he asked whether C.L. had a girlfriend. C.L. said yes, told Sepulveda that he was scared and didn't want to go back to Mexico, and asked Sepulveda to give him a chance.

Then, Sepulveda took C.L. out of the cell and brought him to an office. Sepulveda told C.L. that if another officer saw them, C.L. should say that he was "having an anxiety attack inside the cell." An investigator for the Hidalgo County Sheriff's Office testified that a surveillance video showed Sepulveda taking C.L. into the office.

Inside the office, Sepulveda continued asking C.L. about his girlfriend. Sepulveda also asked C.L. about his sexual activities, masturbation, and pornography. A knock at the door interrupted Sepulveda's questioning. Sepulveda went out to the lobby, and C.L. heard his mother talking to Sepulveda.

C.L. testified that when Sepulveda came back to the office, Sepulveda said, "I can't just let you off like that. You're going to have to do something." C.L. asked about community service, and according to C.L., Sepulveda replied, "I need you to grab that chair, turn out the light[,] and let me suck your dick." Sepulveda then performed oral sex on C.L. C.L. testified that he complied with Sepulveda's order because he "didn't think [he] had an option" since Sepulveda "had [him] there under arrest." After C.L. ejaculated, Sepulveda first told him "to go to the restroom and wash off," but then said, "[n]ever mind, just leave, just leave. Let me walk you out to your mom."

When C.L. got home, he texted his girlfriend about the assault. The text messages were admitted into evidence and corroborated C.L.'s trial testimony. C.L. also texted his girlfriend that he wanted to kill himself.

A few hours after the assault, C.L. reported the incident to his local police department. The Hidalgo County Sheriff's Office dispatched an officer who collected C.L.'s underwear. During the investigation, the Sheriff's Office obtained a search warrant for samples of Sepulveda's DNA.

Samples taken from the front panel of the underwear were tested for DNA. Analysis showed that the samples contained a mixture of DNA from three people. A DNA analyst testified that it was 434 million times more likely that the DNA came from C.L., Sepulveda, and an unknown person than C.L. and two unknown people. The analyst also testified that Sepulveda's DNA could have been transferred to the underwear by touching it.

Laboratory tests did not detect semen on the back panel of C.L.'s underwear. The front panel was not tested for semen. The forensic scientist who performed the tests explained on cross-examination that she did not test the front panel because "it might be a natural occurrence" for "an adult male . . . to have semen on his own boxers."

## B.

About two days after C.L.'s assault, Sepulveda was allegedly involved in a similar incident.

During the early morning hours of June 30, 2019, Progreso Police Officer Jacob Rivera stopped a vehicle for a broken taillight. After Rivera made the stop, Sepulveda arrived with another officer, Eric Rodriguez. At trial, Rivera testified that there were "[t]hree boys and four girls" in the car. Rivera asked the driver for his license and insurance. Although the driver had neither, Rivera decided not to arrest him.

Rivera determined that the occupants of the car were all between 16 and 17 years old and told Sepulveda that he wanted to have their parents come pick them up. One of the girls' mothers picked up all the girls. But Sepulveda told Rivera that the father of two of the boys was not answering the phone. Although Rivera proposed having the parent of the other boy take those two with him, Sepulveda said that he would take the remaining two boys back to the police station.

Rivera testified that Sepulveda told Rodriguez to ride with Rivera, and then Sepulveda left with the minors.  Rivera and Rodriguez stayed at the scene and waited for a tow truck to remove the vehicle.  After the tow truck finished, they did not return to the station because Sepulveda called and told them to watch for a high-speed pursuit approaching Progreso.  Rivera testified that these calls came over the phone and that he was not provided with a radio.  For thirty or forty minutes, Rivera and Rodriguez waited for the chase.  Meanwhile, Rivera checked in three or four times with Sepulveda, who told him to "[s]tand by."

When Rivera and Rodriguez gave up on the chase and headed back to the station, they found Sepulveda there alone.  Rivera asked him where the children were, but Sepulveda "changed the subject and said that a city manager called for him to take them home."  After about ten minutes, Rivera and Rodriguez were called to the scene of a drug overdose.  Sepulveda stayed behind purportedly to take the kids home.  Yet Sepulveda arrived at the scene of the overdose five or ten minutes after Rivera and Rodriguez had left the station.  Sepulveda parked the car thirty or forty feet away from Rivera, and Rivera could not see if the kids were in Sepulveda's car.  Sepulveda left the scene soon after he arrived.

The two passengers that Sepulveda drove to the station were a seventeen-year-old boy named A.A. and his brother.  At trial, A.A. testified that when they arrived at the station, Sepulveda put A.A.'s brother in a cell and took A.A. to an office.  Surveillance video corroborated that Sepulveda went into a separate room with A.A.

In the office, Sepulveda asked A.A. about the size of his penis and ordered A.A. to expose his penis.  A.A. testified that he protested that he did not have an erection, and Sepulveda offered to play a pornographic video.  Sepulveda then used his phone to play a video in which a man and a woman

had sex. The web history from Sepulveda's phone corroborated A.A.'s account that Sepulveda accessed such a pornographic video. A.A. testified that he felt that he could not leave because Sepulveda was a law-enforcement officer and he thought that Sepulveda was detaining or had arrested him. Again, Sepulveda told A.A. to expose himself and watched while A.A. masturbated. A.A. testified that, during this time, Sepulveda made calls on a radio to other officers telling them about a truck headed towards Progreso.

Sepulveda then performed oral sex on A.A. A.A. testified that he felt pain during the encounter. When Sepulveda stopped, he asked A.A. if his "brother would do this type of stuff" and asked A.A. to convince his brother. Back in the cell, A.A. warned his brother about Sepulveda and told him to stall.

Eventually, Sepulveda decided to take A.A. and his brother home. But first, according to A.A.'s testimony, Sepulveda stopped to answer a call about an overdose. Finally, Sepulveda dropped the boys in front of their neighborhood.

## C.

Sepulveda did not testify at trial, instead calling a forensic scientist as an expert witness. Sepulveda's expert testified that the percentage composition of the DNA sample taken from C.L.'s underwear would "usually confirm[] that . . . touch DNA [is] in [the] sample." According to the expert, if there were "blood, semen[,] [or] saliva" in the sample, she "would expect to see more DNA present" from Sepulveda. And the expert testified that a pat-down search would be sufficient to transfer touch DNA to an article of clothing. However, on cross-examination, the expert conceded that a high percentage of DNA material from one contributor of DNA can "mask the percentage from a second individual."

Sepulveda's expert also attacked the government's DNA analysis. She testified that it was irregular to test only samples from the front of the underwear, as opposed to the front and the back, and she criticized the laboratory's failure to analyze the percentage of male DNA in the samples. Moreover, the expert stated that based on the amount of genetic material missing from the samples, she "would question the level of [the] DNA in making any conclusions because it is very low level." The expert identified errors in the laboratory's procedures but admitted on cross-examination that those errors had been corrected.

D.

Sepulveda was indicted by a grand jury on two counts of violating 18 U.S.C. § 242. The first count alleged that Sepulveda, while acting under color of law, sexually assaulted C.L. and thereby deprived him of liberty without due process of law. The second count alleged that Sepulveda, while acting under color of law, sexually assaulted A.A. and thereby deprived him of liberty without due process of law. Further, the second count alleged that Sepulveda's assault of A.A. resulted in bodily injury and included aggravated sexual abuse, attempted aggravated sexual abuse, and kidnapping.

After a two-day trial, the jury found Sepulveda guilty on both counts. As to the second count, the jury specifically found that Sepulveda's conduct resulted in bodily injury and included aggravated sexual abuse, attempted aggravated sexual abuse, and kidnapping.

The district court sentenced Sepulveda to 12 months' imprisonment on the first count and 360 months' imprisonment on the second count, to run concurrently. In addition, the district court ordered Sepulveda to pay $10,000 in restitution to C.L.

This appeal followed.

No. 21-40574

## II.

Sepulveda argues that the government failed to disclose impeachment evidence in violation of the *Brady* rule, and he seeks a new trial on that basis. Because the withheld evidence was not material, we affirm Sepulveda's conviction.[1]

## A.

When a defendant seeks a new trial on *Brady* grounds, he must establish that "(1) the prosecution did not disclose the evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material," meaning that "there is a reasonable probability that if the government had disclosed the evidence, the result of the proceeding would have been different." *United States v. Fernandez*, 559 F.3d 303, 319 (5th Cir. 2009) (quoting *United States v. Infante*, 404 F.3d 376, 386 (5th Cir. 2005)). We review de novo whether the government violated the *Brady* rule. *United States v. Valencia*, 600 F.3d 389, 418 (5th Cir. 2010) (per curiam). To prevail, a defendant "need not show that he more likely than not would have been acquitted had the new evidence been admitted," but rather has to show "only that the new evidence is sufficient to undermine confidence in the verdict."

---

[1] Sepulveda raises an additional issue of whether his rights under the Confrontation Clause of the Sixth Amendment were violated by the prosecution's suppression of this material. But Sepulveda cites no authority that a defendant's Sixth Amendment rights—as opposed to his *Brady* rights—are violated when the prosecution withholds impeachment evidence or when the district court declines to order a new trial on that basis. Indeed, this is not a cognizable Sixth Amendment claim. *See United States v. Wright*, 866 F.3d 899, 912 n.3 (8th Cir. 2017) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1982) (plurality op.)); *see also United States v. Bagley*, 473 U.S. 667, 676-78 (1985) (rejecting appellate court's theory that the withholding of impeachment evidence implicates the Sixth Amendment where there is no "direct restriction on the scope of cross-examination"). Even if a legal basis for such a claim existed, for the reasons explained in this section, any violation of Sepulveda's Confrontation Clause rights was harmless.

*Wearry v. Cain*, 577 U.S. 385, 392 (2016) (per curiam) (cleaned up). In making that determination, we "evaluate the withheld evidence in the context of the entire record." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (cleaned up).

B.

The withheld impeachment evidence concerned A.A.'s prior arrest for sexual assault and pending state criminal case. Specifically, on March 11, 2021, the day after the jury returned its verdict, the government learned from an FBI Victim/Witness Coordinator that A.A. had been arrested in January 2020 for sexual assault. A.A.'s mother had told the FBI Victim/Witness Coordinator about the arrest during A.A.'s testimony.

On March 12, 2021, the government notified Sepulveda's counsel, and three days later, the government filed a sealed motion asking the court for a hearing. The government's papers asserted that A.A.'s case had been referred to the Hidalgo County District Attorney's Office in August 2020 and remained pending. That day, Sepulveda moved for a new trial, arguing that the government had a duty to disclose the arrest to Sepulveda's counsel so that A.A. could have been cross-examined on the issue.

On March 26, 2021, the district court held an initial hearing and granted Sepulveda's motion to substitute counsel. At the hearing, the prosecutor stated that A.A.'s "case was taken to [a] [g]rand [j]ury on March 23rd"—thirteen days after Sepulveda's trial ended—"and was no-billed." Sepulveda's new attorney asked to withdraw the pending motion for a new trial to give him time to conduct due diligence for his client. The district court granted the request and advised counsel that he could refile a new motion.

Although Sepulveda does not appear to have renewed his motion in a filing, the district court considered Sepulveda's motion for a new trial at the

sentencing hearing.  The district court noted that the charges against A.A. had been "dropped or dismissed."  Relevant here, Sepulveda's counsel argued that the withheld information would have provided a basis for the jury to conclude that A.A. would have been granted "leniency on his pending case in exchange for his testimony."  In response, the prosecutor explained that when she "found out about the arrest, [she] did contact the District Attorney's Office to see what the status was," but she "was not told when it was going to go to [the] grand jury and [she] did not direct them to take it to [the] grand jury."  Rather, according to the prosecutor, "[i]t just so happened that they then took it to [the] grand jury while this was going on . . . and the grand jury no-billed the case."

The district court concluded that the evidence of "a mere allegation against [A.A.]" would not have been admissible to impeach A.A.  The district court explained that it did not appear that "there was any sort of deal struck or agreement with the state authorities."  Since the government was not "even aware until after the testimony" about A.A.'s case, the district court decided that it was "impossible for there to have been some kind of an agreement or understanding with the witness."  The district court recognized that the District Attorney might have "manipulated" the case presented to the grand jury "by not presenting good evidence."  Still, the district court denied the motion for a new trial.

## C.

Sepulveda's *Brady* theory is that evidence of A.A.'s arrest and "pending prosecution" would have been used to impeach A.A.'s "possible bias or motive . . . for testifying in a particular manner."  However, beyond arguing that law enforcement first approached A.A. about Sepulveda's alleged assault on him and that the jury "was left with the impression that A.A. had no experience with law enforcement and had no arrests,"

No. 21-40574

Sepulveda does not explain how evidence related to the arrest would have been used to impeach A.A.'s motive or how that impeachment evidence would have been material under *Brady*.

The government argues that evidence of A.A.'s arrest and open criminal case was not material because it (1) would not have been admissible to impeach A.A., and (2) did not undermine confidence in the verdict given the other evidence at trial.

Notwithstanding the government's first argument, "[e]vidence may be material under *Brady* even though it is inadmissible," and so "we apply the general *Brady* test and ask only whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different." *United States v. Sipe*, 388 F.3d 471, 485 (5th Cir. 2004) (cleaned up); *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011). However, because the withheld evidence here does not undermine confidence in the verdict, we conclude that no *Brady* violation occurred.

There is no reasonable probability that if the government had disclosed the evidence of A.A.'s arrest and pending criminal case, the result of the proceeding would have been different. *Fernandez*, 559 F.3d at 319. Even assuming that the withheld evidence of A.A.'s arrest and pending state criminal case were admissible, would have led to admissible evidence, or would have led to permissible cross-examination of A.A. on those topics, A.A.'s credibility would not have been seriously called into question. Moreover, A.A.'s testimony was corroborated by substantial evidence.

Sepulveda's theory of how he would have used evidence of A.A.'s arrest and pending criminal case to impeach A.A. rests on speculation. Sepulveda does not point to any evidence that federal prosecutors could have influenced the Texas prosecutor's conduct before the grand jury or the grand jury's findings. Nor does he point to any evidence of contacts between the

11

federal and Texas prosecutors during the trial, or between A.A. and the Texas prosecutors. Sepulveda also offers no evidence that Texas prosecutors were aware of A.A.'s testimony in this case during the trial, or that A.A. was even aware that his criminal case remained pending. At most, the federal prosecutor contacted the Texas prosecutor after Sepulveda's trial to ask about the status of A.A.'s case—but there is no evidence that she ever told the Texas prosecutor about A.A.'s testimony.[2] Even if she had, there is no evidence that A.A. knew about the grand jury proceedings such that he could have manipulated his testimony. Sepulveda's assertion that the withheld evidence might have led A.A. to make exculpatory admissions regarding how the Texas prosecution influenced his testimony is therefore built on conjecture. Again, Sepulveda, with new counsel, chose not to refile his motion requesting an evidentiary hearing at which he could have probed the above. Such an attenuated chain of inferences does not give rise to a reasonable probability that Sepulveda's case would have turned out differently.[3]

At best, Sepulveda could have caught A.A. in a lie about whether he had been arrested before. On direct examination, the government asked A.A., "[h]ave you ever been arrested or anything like that in the past," as part of a line of inquiry about whether A.A. had thought that Sepulveda's questions about sex were normal. A.A. said no. If Sepulveda's counsel had

---

[2] Once the prosecutor "found out about the arrest," she "contact[ed] the District Attorney's Office to see what the status was." She "was told that it was one case in a bunch of boxes of cases that were waiting to go to [the] grand jury. [She] was not told when it was going to go to [the] grand jury and . . . did not direct them to take it to [the] grand jury."

[3] While the fact that the state grand jury returned a no-bill less than two weeks after Sepulveda's trial ended and after the federal prosecutor contacted Texas might change a trial court's Rule 403 balancing as to admissibility, the timing of the no-bill or the post-trial contact with Texas are not evidence of collaboration between the federal and state prosecutors that would render Sepulveda's impeachment theory non-speculative.

known about A.A.'s arrest and pending case, A.A. could have been cross-examined about why he had not told the truth about his arrest, and Sepulveda's counsel could have attacked A.A.'s credibility on this basis.

However, A.A.'s testimony that Sepulveda sexually assaulted him in the police station was corroborated extensively by other testimony and evidence. Rivera testified that Sepulveda inexplicably separated A.A. and his brother from the other kids at the scene of the traffic stop, took them to the station, and delayed Rivera and another officer from returning to the station. Meanwhile, surveillance video showed that Sepulveda took A.A. into an office in the police station where the assault allegedly happened. A.A. testified that Sepulveda showed him a pornographic video, and Sepulveda's web browser history was consistent with that testimony.

A.A.'s testimony also mirrored C.L.'s testimony about his assault. Like A.A., C.L. testified that Sepulveda asked him sexual questions, took him into an office in the police station, and performed oral sex on him. And C.L.'s account was also corroborated. C.L. texted his girlfriend about the assault, and the evidence showed that it was 434 million times more likely that DNA on C.L.'s underwear came from C.L., Sepulveda, and an unknown person than C.L. and two unknown people.

Given the evidence that Sepulveda sexually assaulted A.A. in the same manner as he sexually assaulted C.L., the withheld evidence that A.A. had been arrested for sexual assault and had a pending criminal case does not undermine confidence in the verdict. Indeed, on appeal, Sepulveda does not try to explain how or why C.L.'s and A.A.'s testimony converged.

For those reasons, the withheld evidence is not material under *Brady*, and Sepulveda is not entitled to a new trial.

No. 21-40574

III.

Next, Sepulveda argues that the district court improperly determined his sentence based on his silence during the sentencing hearing. Specifically, Sepulveda contends that the district court drew an adverse inference from his refusal to speak in violation of his Fifth Amendment privilege against self-incrimination. But contrary to the premise of this claim, the district court did not draw an adverse inference in determining Sepulveda's sentence. Accordingly, we affirm the district court on this issue.

A.

The standard of review that applies on appeal of a criminal sentence depends on whether the defendant challenges a procedural error in the sentencing or the sentence's substantive reasonableness. *See United States v. Coto-Mendoza*, 986 F.3d 583, 585 (5th Cir. 2021). Where the district court made a "significant procedural error," *Gall v. United States*, 552 U.S. 38, 51 (2007), we must remand for resentencing unless the error was harmless, *Coto-Mendoza*, 986 F.3d at 585. On the other hand, we review "substantive unreasonableness for abuse of discretion." *United States v. Zarco-Beiza*, 24 F.4th 477, 480-81 (5th Cir. 2022). However, if the defendant does not preserve a claim of procedural error or substantive unreasonableness in the district court, plain error review applies. *Id.* at 481-82 (substantive unreasonableness); *United States v. Peterson*, 977 F.3d 381, 392 (5th Cir. 2020) (procedural error).

Since Sepulveda's challenge fails under any standard of review, we need not decide whether this issue concerns a procedural error or the substantive reasonableness of the sentence, or, in either case, whether Sepulveda preserved that error for appellate review.

14

B.

In preparation for sentencing, the Probation Department prepared a Presentence Investigation Report ("PSR"). Probation revised the PSR to include information from a Declaration of Victim Losses submitted by C.L. The PSR calculated Sepulveda's total offense level under the Sentencing Guidelines as 43. Based on that offense level, a criminal history category of I, and the statutory maximum sentences for both counts, the Guidelines range for the first count was 12 months' imprisonment and the range for the second count was life imprisonment.

At the sentencing hearing, the district court addressed Sepulveda and said, "I know you did not testify and forced the [g]overnment for its burden of proof but now that the trial's over, I don't know what you want to say but you get to speak. If there's anything you want to say, now is your chance to speak." Sepulveda said, "[n]o comment."

The district court sentenced Sepulveda to the statutory maximum of 12 months' imprisonment on the first count, 18 U.S.C. § 242, and varied downward from the Guidelines range of life imprisonment on the second count to 360 months' imprisonment. In fashioning that sentence, the district court explained that it had considered "the extreme conduct, the very serious offense, the magnitude of the impact on these two young victims," as well as Sepulveda's "youth" and "what a life sentence means to a 25 year old." The district court concluded that a "60 or 70 year sentence" would not be "just" but asserted that a sentence of 360 months' imprisonment would be "appropriately punitive," would "deter others from considering such conduct," and would "protect the community from . . . Sepulveda reoffending." After stating those reasons for the sentence on the record, the district court awarded restitution to C.L.

Finally, the district court directly addressed Sepulveda. In relevant part, the district court criticized Sepulveda:

> Mr. Sepulveda, the evidence . . . in this case . . . was overwhelming. I know you wanted to preserve your appellate rights. I am disappointed that you didn't take the opportunity to at least apologize or show any empathy towards what happened to these young men who . . . a unanimous jury was convinced were very sincere. . . . These individuals were very candid and truthful testifying about things that were very emotional, and it's disappointing to me that you didn't at least show some empathy towards them.
>
> I understand that you need to preserve your [Fifth] Amendment rights because of appeal but that wouldn't have prevented you from offering empathy as any of us who listened to them and watched them would have had for these young individuals.

After the district court finished discussing Sepulveda's lack of empathy, the district court explained to Sepulveda why it had imposed such a long sentence. The district court did not mention Sepulveda's silence again.

## C.

Contrary to Sepulveda's argument, the record does not indicate that district court drew an adverse inference from Sepulveda's silence in determining his sentence. Rather, the court's reference to Sepulveda's silence appears to have been separate and distinct from the sentencing and did not have an adverse effect on his sentence.

In *Mitchell v. United States*, the Supreme Court held that a sentencing court may not draw an adverse inference about the "factual . . . circumstances and details of the crime" from the defendant's silence because such an inference impermissibly burdens the defendant's Fifth Amendment right

against compelled self-incrimination. 526 U.S. 314, 328 (1999); *see id.* at 327-30; *United States v. Ronquillo*, 508 F.3d 744, 749 (5th Cir. 2007) (discussing *Mitchell*). *Mitchell* declined to reach the issue of whether a sentencing court may draw an adverse inference about the defendant's lack of remorse or any other factor relevant in sentencing from the defendant's silence. *See Mitchell*, 526 U.S. at 330 ("Whether silence bears upon the determination of a lack of remorse . . . is a separate question. It is not before us, and we express no view on it."). The parties have not identified any authority in our circuit that has squarely addressed that issue. *Cf. United States v. Caro*, 597 F.3d 608, 629 (4th Cir. 2010) (describing circuit split on whether *Mitchell* extends to adverse inferences about remorse in the capital sentencing context).

We need not decide the difficult question of whether a district court may draw an adverse inference about remorse from a defendant's silence because the district court here did not draw an inference that was adverse to Sepulveda in a constitutionally relevant way.

Even assuming that the Fifth Amendment does protect a defendant from adverse inferences drawn from his silence about his remorse, such an inference would be adverse to the defendant and therefore impermissible only when it affects his sentence. *See United States v. Johnston*, 789 F.3d 934, 943 (9th Cir. 2015) (holding that defendant was not entitled to resentencing due to adverse inference drawn from defendant's failure to testify because the defendant's "sentence was not affected"); *cf. Ronquillo*, 508 F.3d at 749 (finding no constitutional problem where the district court did not "draw any inference at all" from the defendant's silence, let alone an inference "concerning a fact of [the] offense," instead noting "its doubt concerning whether [the defendant] was repentant for his crime"); *United States v. Riascos Tovar*, 782 F. App'x 347, 348 (5th Cir. 2019) (per curiam) (similar). In other words, if the district court doesn't use the inference against the

defendant in crafting the sentence, nothing of Fifth Amendment significance has occurred.

This rule follows from *Mitchell*. There, the sentencing court drew adverse factual inferences from the defendant's silence at a sentencing hearing that "determine[d] the specifics of the crime" and may have resulted in a harsher sentence. 526 U.S. at 329. Specifically, the sentencing judge "held it against" the defendant that she "didn't come forward" to negate or explain testimony that she "had been a drug courier on a regular basis," and accordingly found her responsible for selling more than five kilograms of cocaine. *Id.* at 319. That quantity of cocaine triggered a ten-year mandatory minimum sentence. *Id.* In effect, the government had "enlist[ed] the defendant" in meeting its "burden of proving facts relevant to the crime at the sentencing phase." *Id.* at 330. And so "the central purpose of the [Fifth Amendment] privilege—to protect a defendant from being the unwilling instrument of his or her own condemnation," was implicated. *Id.* at 329. If the sentencing court in *Mitchell* had drawn inferences about facts that were not "relevant to the crime," *id.* at 330, or about facts that were not disputed, *see Ronquillo*, 508 F.3d at 749 ("*Mitchell* is inapplicable to the sentencing decision . . . because 'the facts of the offense' were based entirely on [the defendant's] admissions."); *Riascos Tovar*, 782 F. App'x at 348 (similar), the defendant might still have been an unwilling instrument—just not of his own condemnation. Accordingly, those inferences would not have been constitutionally problematic.

In this case, any inference the district court drew from Sepulveda's "[n]o comment," did not affect his sentence. The district court only commented on Sepulveda's silence after it had imposed a sentence and stated its reasons for doing so. At no point in its comments about Sepulveda's silence or at any other time did the district court suggest that lack of remorse, lack of empathy, or any other inference about Sepulveda or Sepulveda's

crime drawn from his silence affected the sentence.    Moreover, in commenting on Sepulveda's apparent lack of empathy for the victims, the district court recognized Sepulveda's Fifth Amendment rights. *See Johnston*, 789 F.3d at 943 (concluding that defendant's sentence was not affected in part because trial judge "explicitly recognized that remaining silent was 'his right'").

For those reasons, Sepulveda is incorrect that in sentencing him, the district court "drew an adverse inference" from his silence that "may have resulted in added imprisonment." Sepulveda does not point to any specific foundation in the record for his claim that the district court relied on his lack of remorse in determining his sentence. While the district court may have criticized Sepulveda's silence, it walled off its reproach from the rest of its sentencing decision. Accordingly, any inferences the district court drew from Sepulveda's refusal to comment at the sentencing hearing did not adversely impact his sentence and did not burden his Fifth Amendment privilege against compelled self-incrimination.

## IV.

Finally, Sepulveda challenges the $10,000 in restitution that the district court awarded to C.L. Since a sufficient evidentiary basis existed for this award, we affirm the restitution order.

## A.

Sepulveda did not preserve this issue, and he does not seem to dispute that plain-error review applies. To establish plain error, a defendant must show that the district court committed an error that was clear or obvious and that affected his substantial rights. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). If those conditions are met, we have the discretion to remedy the error but should only do so if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (cleaned up).

Notwithstanding the parties' apparent agreement that we should review this issue for plain error, we generally review the legality of a restitution order de novo even if a defendant failed to preserve the issue, because restitution that exceeds the court's statutory authority is an illegal sentence, which always constitutes plain error. *United States v. Penn*, 969 F.3d 450, 458 (5th Cir. 2020) (citations omitted). "[A]n order of restitution that exceeds the victim's actual losses or damages is an illegal sentence." *United States v. Chem. & Metal Indus., Inc.*, 677 F.3d 750, 752 (5th Cir. 2012) (citation omitted). Applying those principles, some of our cases have reviewed de novo the amount of restitution ordered where the defendant attacks the causal link between the restitution ordered and the offense. *Id.*; *cf. United States v. Swenson*, 25 F.4th 309, 322 (5th Cir. 2022) (reviewing restitution order de novo where defendant argued that the award included activity that was not part of the convicted offense). But in other cases, we have applied an abuse-of-discretion standard under similar circumstances. *See United States v. Arledge*, 553 F.3d 881, 897 (5th Cir. 2008). Recently, we stated that "[w]e review the legality of [a restitution] award de novo, . . . its amount for abuse of discretion," and the court's "[factual] finding regarding the amount of loss . . . for clear error." *United States v. Williams*, 993 F.3d 976, 980 (5th Cir. 2021) (citations omitted).

Because the amount of restitution ordered here survives de novo review, we need not reconcile these cases and decide whether some less stringent standard of review applies.

## B.

The PSR recommended that the district court order restitution under the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663. The PSR also stated that the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, applied. The PSR summarized C.L.'s assertions that,

because of Sepulveda's offense, he lost his job and his monthly income of $1,000. C.L. requested 20 months of lost income, or $20,000 in restitution.

C.L.'s Declaration of Victim Losses and Victim Impact Statement described how the offense impacted his finances. C.L. stated that he became insolvent and suffered substantial harm to his ability to obtain credit. He further explained that he lost his job at a pizzeria a month after the incident because of his "mental problems" and "me[e]tings with agents." The offense caused him to "spend most of [his] time in [his] room alone" and to feel "afraid" and "ashame[d] to be seen in public." He had started counseling and experienced anger, anxiety, fear, guilt, sleep loss, nightmares, chronic fatigue, depression, forgetfulness, and difficulty concentrating. Because he earned $1,000 per month at the restaurant and had been out of work for twenty months due to the incident, his lost income added up to $20,000.

At the sentencing hearing, the district court ordered Sepulveda to pay $10,000 in restitution to C.L. and identified the factual basis for its calculation:

> [T]he victim made a financial claim—everybody has seen it— for sums that the victim sincerely thought that the [d]efendant was responsible for, just some lost wages after this incident. The victim's employment ceased. The victim described that because of this offense, emotional issues, the person didn't go back to work, but he also indicated that some of it was because [he was] meeting with agents in preparation for the trial or just the investigation of this matter . . . [which was] time-consuming and prevented the person from working.
>
> I felt that there's some type of compensation that was owed there but I felt the amount requested perhaps overstated what was proximately caused by this event. We also had the pandemic arrive, which accounted for much time, and the

industry in which the person was employed was disproportionately impacted by the COVID pandemic.

### C.

Citing both the VWPA and the MVRA, Sepulveda argues that the record evidence does not show that every dollar of loss accounted for in the restitution order was caused by Sepulveda's offense conduct. We disagree.

While the district court did not specify the statute upon which it relied,[4] under both the VWPA and the MVRA, restitution is limited to "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990) (VWPA context); *see United States v. Maturin*, 488 F.3d 657, 661 n.2 (5th Cir. 2007) (explaining that *Hughey* controls in the MVRA context); *United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012) ("The MVRA limits restitution to the actual loss directly and proximately caused by the defendant's offense of conviction.").

The government bears the burden of "demonstrating the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664(e). The sentencing court resolves any dispute as to the amount of restitution "by the preponderance of the evidence." *Id.* This framework first requires the government to "carry its burden of demonstrating the actual loss . . . by a preponderance of the evidence," and "[t]hen the defendant can rebut the [g]overnment's evidence." *Williams*, 993 F.3d at 980-81. "[E]very dollar must be supported by record evidence." *Sharma*, 703 F.3d at 323. However, the court does not have to make specific findings "if the record provides an

---

[4] While the MVRA requires the district court to order restitution for certain offenses, *see* 18 U.S.C. § 3663A, the VWPA permits a district court to order "a defendant convicted of [a Title 18] offense" to "make restitution to any victim of [the] offense," 18 U.S.C. § 3663(a)(1)(A).

adequate basis to support the restitution order." *United States v. De Leon*, 728 F.3d 500, 507 (5th Cir. 2013) (citation omitted).

Here, the government met its burden to establish that $10,000 of C.L.'s losses were caused Sepulveda's offense conduct. The record included C.L.'s Declaration of Loss and Victim Impact Statement. Those documents provided evidence that the sexual assault harmed C.L.'s mental health, which in turn prevented C.L. from keeping his job at the pizzeria or obtaining other work. They also indicated that C.L.'s involvement with the prosecution of this case interfered with his job. Moreover, those documents established the amount of income C.L. received from his prior employment and lost due to the offense. Based on that unrebutted evidence, it would have been reasonable for the district court to find that C.L. suffered a $20,000 loss, equal to twenty months of his restaurant wage, from Sepulveda's offense conduct. And the district court relied on those facts in determining the amount of restitution authorized by law.

The district court also appropriately considered whether the defendant's conduct had proximately caused all that lost income. *See United States v. Kim*, 988 F.3d 803, 809 (5th Cir. 2021); *Robers v. United States*, 572 U.S. 639, 645 (2014) ("The basic question that a proximate cause requirement presents is whether the harm alleged has a sufficiently close connection to the conduct at issue." (quotation and citation omitted)). The district court determined that ten months of C.L.'s lost income was caused not by Sepulveda's offense conduct but by the impact of the COVID-19 pandemic on the restaurant industry. As such, the district court calculated the amount of C.L.'s loss caused by the sexual assault as ten months of his former income, or $10,000.

On appeal, Sepulveda does not give us any reason to reverse the district court. Sepulveda makes the bare assertion that the restitution award

No. 21-40574

was "excessive" but does not explain why the district court's factfinding was erroneous in any way. And he has never offered any rebuttal evidence regarding the district court's initial calculation of C.L.'s income or its conclusions that Sepulveda's offense conduct caused C.L. to suffer mental health problems, that Sepulveda's offense conduct caused C.L. to miss work for participating in this case, or that the COVID-19 pandemic accounted for ten months of C.L.'s lost work. At its most specific, Sepulveda's brief argues that C.L.'s "emotional issues," "preparation for the trial," and "lost wages" were not "shown to have resulted from [Sepulveda's] actions." But C.L.'s Declaration of Loss and Victim Impact Statement do establish causal relationships among the offense conduct, C.L.'s mental health, the prosecution of this case, and C.L.'s financial loss by a preponderance of the evidence. 18 U.S.C. § 3664(e).

For those reasons, we affirm the $10,000 award of restitution to C.L.

V.

Accordingly, Sepulveda's conviction and sentence are AFFIRMED.